# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 10, 2006          Decided April 6, 2007

No. 05-5033

PHILLIP S. WOODRUFF
APPELLANT

v.

MARY E. PETERS, SECRETARY, U.S. DEPARTMENT OF TRANS-
PORTATION,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 01cv01964)

*Mary G. Sprague*, appointed by the court, argued the cause as *amicus curiae* for appellant. With her on the brief was *Donald R. Gordon*, appointed by the court.

*Peter S. Smith*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Kenneth L. Wainstein*, U.S. Attorney at the time the brief was filed, and *R. Craig Lawrence*, Assistant U.S. Attorney. *Michael J. Ryan* and *William R. Cowden*, Assistant U.S. Attorneys, entered appearances.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

BROWN, *Circuit Judge*: Appellant Phillip Woodruff asserted discrimination and retaliation claims against the Secretary of Transportation. The district court granted summary judgment in favor of the Secretary on both claims. We now reverse the district court's order relating to the discrimination claim, affirm the order relating to the retaliation claim, and remand for further proceedings.

I

For several years, Woodruff worked for the Federal Aviation Administration (FAA), leading a team that produced educational materials. On or about September 29, 1995, Woodruff was injured in a fall at work. One month later, Woodruff's manager, James Boone, signed a telecommuting agreement, permitting Woodruff to work from home up to two days per week. The FAA encouraged such agreements in order to reduce the FAA's environmental impact by minimizing overall commute time, but the FAA Telecommuting Handbook required that the agreements identify in advance the days when the employee would work from home. Woodruff's agreement did not do so, listing his telecommuting days as "variable."

In April 1996, Carson Eoyang took over as Woodruff's manager. Friction with Eoyang and others led Woodruff to file an EEOC complaint in February 1997. The claims asserted in that complaint are not before us in this case.

Meanwhile, Woodruff's symptoms worsened, and he went on leave from April 30, 1997, through February 2, 1998—a period that included back surgery on May 1, 1997, and a lengthy recuperation. While Woodruff was away, Eoyang took on many of Woodruff's supervisory responsibilities himself. Upon

Woodruff's return to work, Eoyang told him he could resume his supervisory duties only when he was able to return to work on a regular basis, with predictable hours that overlapped with those of most of his subordinates. Woodruff followed up with Eoyang repeatedly to see if this decision could be amended. In a typical memo, Eoyang responded:

> While you have gradually increased your hours to 80 hours a pay period, you have yet to be able to resume a regular schedule such that I can rely on your availability as a supervisor.
>
> . . . .
>
> . . . If, at some point, you return to a regular, full-time schedule and are able to work a regular eight- or nine-hour schedule, without the breaks you now have, I will reconsider my decision at that time.

Memorandum from Eoyang to Woodruff (Apr. 30, 1998) ["Apr. 30 Memo"].

Woodruff's return to work proceeded in incremental stages. Citing medical evaluations indicating he needed extensive rest and daily therapy, Woodruff at first worked only four hours a day. He was able to return to full-time work by April, thanks to accommodations from the FAA, including being allowed to work much of the time from home or a telecommuting facility; to take a break in the middle of the day to recuperate; and to choose office hours that minimized his commute time. Eoyang agreed to these accommodations with the following proviso: "if you are unable to work a fixed schedule, I will expect that you will provide me with your weekly work schedule by Friday of the prior week." Memorandum from Eoyang to Woodruff (Feb. 9, 1998).

The FAA Telecommuting Handbook described telecommuting as "a supervisor-approved work option," emphasizing "employees have no automatic right to continue in the program in the event of a change of supervisor or position." Thus, at least formally, Woodruff's telecommuting agreement expired when Eoyang replaced Boone, and Eoyang never signed a new agreement.

However, Woodruff apparently viewed Eoyang's February 9 memo as an extension of his earlier telecommuting agreement in all but name. When Debbie Holden, who monitored the FAA's telecommuting program, asked for an update on his agreement, Woodruff simply filled out a new form reflecting the February 9 memo without obtaining a signature from Eoyang. Woodruff submitted such unsigned forms on at least two separate occasions.

Woodruff argues the following protected acts triggered illegal discrimination by Eoyang. First, on August 10, he deposed Eoyang regarding allegations from his February 1997 EEOC complaint. Second, on August 11, he contacted an EEOC Counselor to commence an additional EEOC complaint proceeding regarding Eoyang's refusal to reinstate his supervisory authority. Third, on August 24, he met with the Counselor regarding his second complaint.

Coincidentally or not, Eoyang sent Woodruff a memo on September 3 revoking some of the accommodations Woodruff had previously enjoyed:

> While, heretofore, I have allowed you maximum flexibility with respect to your work schedule – allowing you to work a split schedule providing for a rest period in between and approving both annual and sick leave on a liberal basis – please be advised that I can no longer continue to do so

indefinitely. . . . I can no longer accommodate a schedule whereby I do not know from day-to-day whether you will report to the office or not.

Memorandum from Eoyang to Woodruff (Sept. 3, 1998) ["Sept. 3 Memo"]. In the same memo, Eoyang indicated it had "come to [his] attention" that Woodruff had supplied Holden with unsigned telecommuting forms:

I note that the "updated" agreement you provided Ms. Holden was not signed by me, your supervisor, as required, nor did you ever discuss the agreement with me. . . . [P]lease be advised that I do not consider either the agreement completed in November 1995 or the update you submitted on February 2, 1998, without my knowledge, to be valid.

*Id.* On September 10, 1998, Woodruff again contacted the EEOC Counselor and added Eoyang's September 3 memo to his list of grievances.

Woodruff's second EEOC complaint was officially filed on December 1, 1998. On June 12, 2001, the Department of Transportation (DOT) issued its Final Agency Decision (FAD) on that complaint, dismissing some of the claims and finding for the FAA on the others. Woodruff received notice of the FAD "on or about June 15." Pl.'s Statement Genuine Issues Material Fact ["Woodruff's Issue Statement"] at 9 ¶ 23.

Woodruff filed a complaint against the Secretary in the district court on September 14, 2001, and the court subsequently granted his motion to amend the complaint. Finally, in 2003, Woodruff moved to file a Second Amended Complaint, which

we treat as the official complaint for purposes of the current case.[1]

On January 3, 2005, the court granted summary judgment in favor of the Secretary on all of Woodruff's claims, and Woodruff appealed. After Woodruff's counsel withdrew, this court appointed amicus curiae ("Amicus") to represent Woodruff. Amicus filed briefs challenging the grants of summary judgment only as to Woodruff's claims of (1) discrimination based on disability and (2) retaliation based on EEOC activity. As Woodruff has adopted Amicus's briefs as his own, we consider all other claims abandoned.

II

Before addressing the merits of Woodruff's appeal, we resolve two procedural issues.

First, the Secretary argues Woodruff's complaint before the district court was barred by 42 U.S.C. § 2000e-16(c). That subsection—the basis for discrimination actions against federal employers—requires that district court complaints be filed "[w]ithin 90 days of receipt of notice" of the defendant agency's FAD. Courts apply this limit strictly and "will dismiss a suit for missing the deadline by even one day." *Wiley v. Johnson*, 436 F. Supp. 2d 91, 96 (D.D.C. 2006); *see also Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339 (D.C. Cir. 1997) (giving effect to a complaint filed one day late only because the Depart-

---

[1] While the district court's docket indicates no explicit order granting Woodruff's motion to amend, the court stated that "in April 2004, the court granted the plaintiff's motion to file a second amended complaint," *Woodruff v. Mineta*, No. 1:01-cv-1964, slip op. at 4 (D.D.C. Jan. 3, 2005).

ment failed to raise the untimeliness in its answer). Woodruff has stated he received notice "on or about June 15, 2001," which is 91 days before his district court complaint was filed. If Woodruff received notice of the FAD on or before June 15, his complaint was untimely.

But a plaintiff's failure to meet the § 2000e-16(c) deadline is an affirmative defense, *Harris*, 126 F.3d at 341, and the burden of proof is on the party claiming the deadline was missed. The Secretary has failed to meet the burden here. The DOT sent Woodruff notice of the FAD on June 12, but nothing in the record establishes when Woodruff *received* this notice. The DOT's letter was marked "return receipt requested," but no receipt was introduced into evidence. Woodruff's Issue Statement and exhibits are inconclusive. While we could speculate that Woodruff's statement that he received the notice "on or about June 15" makes it more likely than not that his civil complaint was untimely, such speculation does not take the place of hard proof, which the Secretary simply has not provided. Therefore, the DOT's affirmative defense of untimely filing fails.

Second, the Secretary contends that Amicus's arguments regarding (1) adverse employment actions Woodruff claims to have incurred in September 1998 and (2) Woodruff's status as a "qualified individual with a disability" were not raised before the district court and were thus waived. "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976); *see also Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1039 (D.C. Cir. 2003). Absent "exceptional circumstances," we do not ordinarily entertain issues first raised on appeal. *Marymount Hosp. v. Shalala*, 19 F.3d 658, 663 (D.C. Cir. 1994); *see also Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) (listing examples of

sufficient circumstances). However, this rule is prudential only, not jurisdictional. *Yee v. City of Escondido*, 503 U.S. 519, 533 (1992). Also, "[o]nce a federal claim is properly presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Id.* at 534.

With regard to the September 1998 employment actions, the simple answer is that Woodruff did in fact raise these below. The Second Amended Complaint's list of allegedly "unlawful employment practices" included "[r]evoking the disability accommodations previously granted to Plaintiff," with such revocation arguably having taken place on September 3. In his opposition to the Secretary's motion for summary judgment, Woodruff described as adverse employment actions "a continuing series of events" extending beyond July 10, 1998, including "the rescission of Plaintiff's telecommuting agreement," and cited the September 3 memo. Pl.'s Memo. Points & Auths. Opp. Def.'s Mot. S.J. at 8. Likewise, in relation to the retaliation claim, Woodruff noted Eoyang's "September 10, 1998, refusal to return his supervisory duties and honor his telecommuting and maxi-flex schedule agreements." *Id.* at 12–13. Thus, Woodruff properly challenged the September 1998 actions before the district court, and we may consider their impact on appeal.

The Secretary's argument challenging Woodruff's claim to be a "qualified individual with a disability" is similarly ill-founded. The Second Amended Complaint alleged a "violation of . . . Section 501 of the Rehabilitation Act of 1973" in that Eoyang and others discriminated against Woodruff "based on his . . . disability." 2nd Am. Compl. ¶ 12. Under § 501 of the Rehabilitation Act, codified at 29 U.S.C. § 791, "the Government must take reasonable affirmative steps to accommodate the handicapped, except where undue hardship would result." *Barth*

*v. Gelb*, 2 F.3d 1180, 1183 (D.C. Cir. 1993). Section 501(g) incorporates Title I of the Americans with Disabilities Act of 1990 (ADA) as its test for improper "nonaffirmative action employment discrimination." 29 U.S.C. § 791(g); *see Taylor v. Rice*, 451 F.3d 898, 905 (D.C. Cir. 2006). That title bars only such employment discrimination as harms "a qualified individual with a disability." 42 U.S.C. § 12112(a). Thus, Woodruff's Second Amended Complaint implicitly averred that he was a qualified individual with a disability. While it is true that his opposition to the Secretary's motion for summary judgment did not address this prong of his prima facie case for discrimination, this was presumably because the Secretary's memorandum in support of the motion did not challenge it. Only in the subsequent Reply in Support of Defendant's Motion for Summary Judgment did the Secretary question Woodruff's status as a qualified individual with a disability, a point to which Woodruff had no opportunity to respond. Therefore, we may consider both of Amicus's challenged arguments on appeal.

## III

Turning to the merits, we address first Woodruff's discrimination claim. We review a district court's grant of summary judgment *de novo*. *Johnson v. Executive Office for U.S. Attorneys*, 310 F.3d 771, 774 (D.C. Cir. 2002). Summary judgment is warranted only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Colbert v. Potter*, 471 F.3d 158, 164 (D.C. Cir. 2006). In reviewing a grant of summary judgment, we must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor." *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 850 (D.C. Cir. 2006). As employers rarely maintain records directly evidencing discrimination, "an added measure of 'rigor,' or 'caution,' is appropriate

in applying this standard to motions for summary judgment in employment discrimination cases." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir.) (citations omitted), *judgment vacated*, 124 F.3d 1302 (D.C. Cir. 1997) (en banc).

Pursuant to 42 U.S.C. § 2000e-16(b), the Equal Employment Opportunity Commission ("EEOC") promulgated 29 C.F.R. § 1614.105, which requires employees alleging discrimination based on a "handicap" to "initiate contact with a Counselor within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action," 29 C.F.R. § 1614.105(a)(1). Amicus contends Eoyang's memo of September 3, 1998 constituted discrimination. As Woodruff contacted his Counselor regarding that memo on September 10, 1998, this portion of Woodruff's discrimination claim is not time-barred.

Woodruff's Rehabilitation Act claim incorporates ADA § 102, which provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Here, "discriminate" is defined to include "not making *reasonable accommodations* to the known physical or mental limitations of an otherwise *qualified individual with a disability* who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an *undue hardship* on the operation of the business of such covered entity." § 12112(b)(5)(A) (emphases added); *see also* 29 C.F.R. § 1630.9(a).

The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable

accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Reasonable accommodation" may include "job restructuring" and "part-time or modified work schedules." § 12111(9)(B). "Undue hardship" means "an action requiring significant difficulty or expense," as measured by various statutory factors. § 12111(10)(A); *see also* 29 C.F.R. § 1630.15(d) (confirming that "undue hardship" is an affirmative defense).

Woodruff maintains he is a "qualified individual with a disability," and that the FAA failed to grant him the "reasonable accommodations" his disability necessitated. Taken together, these two statements suffice for a prima facie case of discrimination under 42 U.S.C. § 12112(b)(5)(A). But the two statements are interconnected, as Woodruff's status as a qualified individual with a disability depends on what tasks he can perform given reasonable accommodation. *See Carr v. Reno*, 23 F.3d 525, 529 (D.C. Cir. 1994). Thus, provided Woodruff in fact has a disability, we must "ask simply whether any reasonable accommodation would have allowed [Woodruff] to perform all the essential functions of [his] job without creating an undue hardship for the agency." *Id.* In this context, "consideration shall be given to the employer's judgment as to what functions of a job are essential." 42 U.S.C. § 12111(8).

The Secretary argues Woodruff does not have a disability in the technical sense of 42 U.S.C. § 12102(2). But as noted above, this argument appeared first in the Secretary's Reply to Woodruff's Opposition, at which point Woodruff had no opportunity to develop the record in response. Therefore, we shall not consider the argument here. *See Singleton v. Wulff*, 428 U.S. 106, 121 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be

exercised on the facts of individual cases."); *Sadlowski v. United Steelworkers of Am.*, 645 F.2d 1114, 1120 (D.C. Cir. 1981) ("Typically when summary judgments are upheld on grounds different from those relied on by the district court, the other grounds were urged at trial."), *rev'd on other grounds*, 457 U.S. 102 (1982); *cf. Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1537 (D.C. Cir. 1984) (en banc) (refusing to order summary judgment prior to discovery, as it would be "clearly unjust for the appellate court to direct the issuance of summary judgment" unless the issue "was clearly framed by the proceedings below so that the parties had a legitimate chance to submit all relevant materials and argue their implications"), *vacated on other grounds*, 471 U.S. 1113 (1985). We thus assume Woodruff has a disability.

Eoyang's September 3 memo indicated Woodruff could no longer count on the accommodations the FAA had *de facto* afforded him: allowing him to set his own schedule and to take breaks in the middle of the day. While it is far from clear such accommodations are reasonable, if we view the facts in the light most favorable to Woodruff his case is at least strong enough to escape summary judgment. The FAA Telecommuting Handbook anticipates "[e]mployees may telecommute . . . as frequently as five days a week." The FAA allowed another employee in Woodruff's division to lead a team in Washington, D.C., while working in Florida. Dolan Dep. 55–59 (Aug. 11, 1998). Such evidence, together with Woodruff's description of his team as "mostly . . . self-directed," suggests Woodruff did not have to be physically present in the office. Indeed, both Boone and Eoyang allowed Woodruff to work with the proposed accommodations for months, casting doubt on the suggestion that the accommodations would impose undue hardship on the FAA, or that even with such accommodations Woodruff would be unable to perform all the essential functions of his job. Thus,

there remains a genuine issue of material fact as to Woodruff's discrimination claim, and summary judgment was inappropriate.

IV

Woodruff also challenges the district court's grant of summary judgment on his retaliation claim. Amicus suggests two acts by Eoyang that might count as retaliation: the refusal to reinstate Woodruff's supervisory authority in February 1998, and the revocation of some of Woodruff's accommodations on September 3, 1998. The February 1998 claim faces temporal problems on both ends. On one side, Woodruff asks us to infer causation based on temporal proximity alone, when the supposed trigger acts took place in February—or at the latest April—of 1997, at least nine months before the supposed response. On the other side, Woodruff failed to present this claim to an EEOC Counselor within 45 days, and the exhaustion requirement from 29 C.F.R. § 1614.105(a)(1) at least arguably applies to retaliation claims as well. *See Nealon v. Stone*, 958 F.2d 584, 590 (4th Cir. 1992) (collecting cases). As we find unrelated grounds on which to reject Woodruff's retaliation claim, however, we assume without deciding that neither of these problems sinks his February 1998 argument.

Section 501 of the Rehabilitation Act incorporates ADA § 107, which in turn incorporates "[t]he powers, remedies, and procedures set forth in sections 705, 706, 707, 709, and 710 of the Civil Rights Act of 1964," 42 U.S.C. § 12117. Thus, we apply Title VII's *McDonnell Douglas* burden-shifting framework to retaliation claims under the Rehabilitation Act when employers assert non-retaliatory grounds for adverse employment actions. *See Smith v. District of Columbia*, 430 F.3d 450, 455 (D.C. Cir. 2005) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to an ADA retaliation claim); *Barth v. Gelb*, 2 F.3d 1180, 1186 (D.C. Cir. 1993) (limiting applicabil-

ity of *McDonnell Douglas* framework to cases in which the employer proffers a permissible ground for the action).

The plaintiff carries an initial burden of establishing a prima facie case of retaliation by showing (1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action. *Smith*, 430 F.3d at 455; *see also McDonnell Douglas*, 411 U.S. at 802. If the plaintiff succeeds, the burden of production shifts to the defendant, who must articulate some legitimate, non-retaliatory reason for the adverse action, *see Smith*, 430 F.3d at 455; *McDonnell Douglas*, 411 U.S. at 802, but the ultimate burden of persuasion remains always with the plaintiff, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Once the defendant proffers the requisite explanation, the plaintiff must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for [retaliation]." *Id.* (internal quotation marks omitted); *see also McDonnell Douglas*, 411 U.S. at 805 (describing the proffer as "presumptively valid").

Woodruff's filing of an EEOC complaint in February 1997 and his deposition of Eoyang pursuant to that complaint in August 1998 were protected acts. In February 1998, when Woodruff returned to work following his surgery, Eoyang refused to reinstate his earlier supervisory authority. Subsequently, in his memo of September 3, Eoyang revoked some of the accommodations Woodruff had previously enjoyed. Viewing the facts in the light most favorable to Woodruff, we find these are both adverse employment actions, and Woodruff has established the first two prongs of his prima facie case of retaliation.

Lacking a smoking gun from the FAA that would establish causation, Woodruff asks us to infer a causal link from the temporal proximity between the protected events and the adverse actions. Temporal proximity can indeed support an inference of causation, *e.g.*, *Mitchell v. Baldrige*, 759 F.2d 80, 86 (D.C. Cir. 1985), but only where the two events are "very close" in time, *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing favorably *Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209 (10th Cir. 1997), which rejected such an inference where the events were three months apart). As less than a month separated Woodruff's deposition of Eoyang from Eoyang's September 3 memo, a reasonable finder of fact could infer causation in that area without more. But the link between Woodruff's 1997 EEOC complaint and Eoyang's refusal in February 1998 to reinstate Woodruff's supervisory authority is much more tenuous. Woodruff argues that we should measure the gap, not from his filing of the complaint, but from the Counselor's investigations in or around April 1997, and that the period of Woodruff's medical leave should toll the gap calculation, as Eoyang removed Woodruff's authority at the first possible moment, as soon as Woodruff returned to work. As indicated above, we assume for present purposes that these novel arguments are correct.

In response, the Secretary proffers legitimate reasons for each adverse action. Eoyang explained his reasons for refusing to reinstate Woodruff's supervisory authority as follows:

> Simply put, to be an effective supervisor, you must be available to your subordinate employees on a regular, full-time basis. . . . While you have gradually increased your hours to 80 hours a pay period, you have yet to be able to resume a regular schedule such that I can rely on your availability as a supervisor.

. . . [Y]ou work several hours in the morning, have a rest period of anywhere from one to three hours, and then work several hours in the afternoon. . . . [This] is not an appropriate schedule for a supervisor. Your unavailability to subordinate employees during the hours that you must rest, in addition to the fact that you are not able to predict how long those rest periods will be, is not practical for a team lead position.

Apr. 30 Memo.[2] As for Eoyang's subsequent revocation of Woodruff's accommodations, those accommodations were always contrary to FAA policy. The FAA Telecommuting Handbook emphasizes that "[t]he specific days and work hours the employee will telecommute *must* be identified in advance and included in the telecommuting agreement," and that "unstructured arrangements where employees telecommute *at will*, on a day-to-day basis, based on personal choice, are *not permitted*." Eoyang explained all of this to Woodruff in his September 3 memo, in which he revoked Woodruff's non-standard arrangement.

At this stage, "the *McDonnell Douglas* framework disappears," *Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005), and we must simply determine whether Woodruff has put forward enough evidence to defeat the proffer and support a finding of retaliation. In exceptional circumstances, the evidence supporting a plaintiff's prima facie case may, on its own, suffice to defeat the proffer's presumption of validity and thus render summary judgment improper. But here, Woodruff's

---

[2] In his discrimination claim, Woodruff of course asserts that none of the job requirements described in Eoyang's memo are valid. As the Secretary bears only a burden of *production* at this stage of the *McDonnell Douglas* framework, however, we need not resolve this dispute here.

only evidence linking his protected activities to the adverse employment actions is the proximity in time between the events. If temporal proximity sufficed to rebut a legitimate proffer, then protected activities would effectively grant employees a period of immunity, during which no act, however egregious, would support summary judgment for the employer in a subsequent retaliation claim. Assuming the intention behind the ADA's retaliation provisions was to protect the remedial scheme but not to create a permanent discipline-free zone for complainants, we conclude positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.

Eoyang essentially claimed he subjected Woodruff to the alleged adverse actions because (1) Woodruff was not available to his subordinates during regular work hours, and (2) Eoyang did not consistently know in advance when Woodruff would be at work. Woodruff responds to these proffers along three lines.

First, Woodruff contests Eoyang's characterization of his past work performance. But Amicus cites no evidence on point. Eoyang complained in September 1998 that he "d[id] not know from day-to-day whether [Woodruff] w[ould] report to the office or not." Sept. 3 Memo. This matches Eoyang's complaint from April 1998 that Woodruff was not available on a "regular" basis. In response, Woodruff testified that he "was into the office like three, sometimes four days a week," Woodruff Dep. 40 (May 5, 2004), but this still would not make him "available" at all regular work hours. Woodruff's November 25, 1998 memo, in which he states—without evidence and not under oath—that it had been his practice "to accomplish the full schedule of 80 hours required during each pay period, with a majority of the time being in regular duty status (e.g. not telecommuting)," is likewise insufficient. Woodruff's assertion in his deposition that Eoyang's estimate of his midday breaks as "one to three hours"

was "highly exaggerated" is belied by Woodruff's own Summary Judgment Exhibit 18, in which he reports a break of two-and-a-half hours on March 26.

Second, Woodruff argues that while he might not have been in the office at all times, he was always present when his duties required him to be there. But Eoyang clearly indicated supervisors were *always* to be present. The fact that Woodruff allowed his own subordinates greater flexibility, Woodruff Dep. 123–24, in no way implies Eoyang had to do the same. Woodruff's argument that his flexible work schedule was a necessary accommodation for his disability is unresponsive: While this might support his discrimination claim, it does not contradict the Secretary's proffered justification for canceling Woodruff's accommodation.

Third, Woodruff maintains he attempted to conclude telecommuting agreements with Eoyang to no avail. This is again unresponsive. Such an agreement would not have rendered Woodruff any more available during the hours when he had to rest or attend medical appointments; nor would an agreement guaranteeing Woodruff a flexible commuting schedule have addressed Eoyang's concern about not knowing in advance when Woodruff would be in the office.[3]

In summary, Woodruff argues he could do his job despite the shortcomings Eoyang cited, but does not present evidence from which the finder of fact could infer Eoyang agreed. This

---

[3] While acknowledging that most of his proposals to Eoyang contained such a flexibility provision, Woodruff claims that in one draft agreement he suggested a fixed schedule. But he has been unable to produce the purported draft or to corroborate in any way this claim that is so thoroughly at odds with all of his other, documented activities.

is insufficient. We review not "the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." *Fischbach v. D.C. Dep't of Corrections*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (alterations and internal quotation marks omitted). Even if the finder of fact were to credit all of Woodruff's evidence, there would be no basis for rejecting the presumptive validity of Eoyang's explanation as to both the February and September employment actions. Therefore, the district court acted properly in granting summary judgment to the Secretary on Woodruff's retaliation claim.

V

For the reasons outlined above, we affirm the district court's grant of summary judgment as to Woodruff's retaliation claim, but we reverse the grant of summary judgment as to his discrimination claim. The case is remanded to the district court for further proceedings.

*So ordered.*