*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CV-783

JASON KOLOWSKI, APPELLANT,

V.

DISTRICT OF COLUMBIA, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CAB-3663-16)

(Hon. Anthony C. Epstein, Trial Judge)

(Argued November 5, 2020                    Decided December 31, 2020*)

*Donna McL. Murphy*, with whom *Judith L. Wheat* and *Nikita West* were on the brief, for appellant.

*Holly M. Johnson*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren l. AliKhan*, Solicitor General, and *Carolyn S. Van Zile*, Deputy Solicitor General, were on the brief, for appellee.

Before GLICKMAN, BECKWITH, and EASTERLY, *Associate Judges*.

---

\* The decision in this case was originally issued as an unpublished Memorandum Opinion and Judgment. It is now being published upon the court's grant of appellee's motion to publish.

GLICKMAN, *Associate Judge*:  Dr. Jason Kolowski is a former employee of the District of Columbia Department of Forensic Services ("DFS").  After Dr. Roger Mitchell, then-Interim Director of DFS, terminated his employment, Dr. Kolowski sued the District under the Whistleblower Protection Act ("WPA"),[1] claiming that Dr. Mitchell terminated him because of a protected disclosure he had made in the course of his employment.  The trial court granted the District's motion for summary judgment, finding there was no triable issue as to whether Dr. Mitchell was aware of Dr. Kolowski's protected disclosure.  We affirm.

## I.

Unless noted otherwise, the following facts are undisputed for purposes of this appeal.  In the spring of 2012, Dr. Kolowski began working as a DNA lab manager with the Metropolitan Police Department ("MPD").  At that time, and at all relevant times in this case, Dr. Kolowski was an at-will employee of the District.

Later that year, the District created DFS to provide forensic science services to multiple stakeholders.  Those stakeholders included MPD, the Office of the Chief Medical Examiner, the Office of the Attorney General, the Department of Health, and the Fire and Emergency Medical Services Department.  DFS absorbed MPD's

---

[1]  D.C. Code § 1-615.51 *et seq.* (2016 Repl.).

DNA lab, and as part of the consolidation, Dr. Kolowski was transferred to DFS and later promoted to director of its DNA lab.

In 2014, a nonprofit organization tipped Dr. Kolowski that duplicate firearms were recorded twice in MPD's casework firearms database. Dr. Kolowski investigated the issue and discovered that dozens of firearms had been logged into the database twice as having been used in separate, unrelated crimes. In early 2015, Dr. Kolowski delivered a report containing that finding to DFS's then-General Counsel Christine Funk. Ms. Funk advised Dr. Kolowski that she would confirm and verify his findings and have her staff conduct a separate investigation.

On April 25, 2015, an independent accreditation board temporarily suspended the accreditation of DFS's DNA lab after discovering that the lab suffered from several quality control issues. In an effort to rehabilitate its reputation with its stakeholders, DFS cleaned house and reorganized: On April 30, Ms. Funk and three other high-ranking DFS officials either resigned or were terminated from their employment; Deputy Mayor Kevin Donahue met with the remaining managers of DFS (including Dr. Kolowski), reassured them that their jobs were safe, and charged them with bringing the DNA lab back to accreditation; and Mayor Muriel Bowser appointed Dr. Roger Mitchell to serve as DFS's Interim Director.

In a sworn declaration, Dr. Mitchell attested that his main goal "was to restore DFS's accreditation to perform DNA testing." To that end, Dr. Mitchell promoted Dr. Kolowski to serve as the Director of Special Operations. Dr. Kolowski's main task was to facilitate the outsourcing of DNA casework to a private lab. That work was vitally important, as the District points out, because District law at the time required DFS to "process all sexual assault forensic examination kits within 90 days from the date of receipt."[2] Dr. Mitchell, according to Dr. Kolowski, suggested that if he did well in his new position, he could receive another promotion.

In early May of 2015, and as a result of the loss of accreditation in its DNA lab, DFS was "under chaos mode," Dr. Kolowski testified, "working feverishly to maintain and improve [its] relationship[] with [its] stakeholders." Dr. Mitchell took a highly involved role in that process: Dr. Mitchell met with Dr. Kolowski and his team "on a nearly daily basis," Dr. Kolowski testified, "to touch base on the ongoing progress of fixing" DFS's lack of accreditation; and Dr. Mitchell expected "all employees working under him in DFS leadership roles" to "br[ing] to his attention" "all information regarding the operation of DFS and [its] challenges," according to Randall Wampler, a former director at DFS.

---

[2] D.C. Code § 4-561.02(b) (2014) (amended 2020).

On May 4, a little before 11:00 a.m., Dr. Mitchell received a letter via email from the United States Attorney's Office ("USAO") containing a number of questions, including several questions about the number of untested sexual assault kits still in the possession of DFS. The email noted that DFS's answers to its questions would "assist in today's meeting." It is unclear what "meeting" the email was referring to, but Dr. Mitchell was set to testify later that day at 2:00 p.m. in an oversight hearing before the Council. Dr. Mitchell sent an email to Karen Wiggins, the DFS Deputy Director of Quality and the former director of the firearms lab, asking her to work with Dr. Kolowski and Paul Reedy, the director of DFS's forensic labs, to compile information to answer the USAO's questions. Ms. Wiggins forwarded the email to Dr. Kolowski and Mr. Reedy, asking for answers by 1:00 p.m.

At the May 4 oversight hearing, Dr. Mitchell informed the Council that DFS was still in possession of seventy-seven untested sexual assault kits. That number was incorrect, both parties agree, because DFS actually was still in possession of eighty-five untested sexual assault kits.

Dr. Mitchell received the incorrect number of seventy-seven, he claims, from Dr. Kolowski. "After this incident," Dr. Mitchell attested, "I personally made the decision to terminate [Dr.] Kolowski's employment with DFS because I did not

believe that he could competently manage the DNA lab." Dr. Kolowski received word of his termination on May 18, when he was summoned to the D.C. Human Resources Office. He was told at that time that he could either resign or be terminated without cause. He chose the latter.

Dr. Kolowski claims that the proffered rationale for his termination—Dr. Mitchell's belief in his lack of competence—was a pretext, and that Dr. Mitchell had no reservations about his competence whatsoever. Dr. Kolowski denies that he furnished the erroneous number of sexual assault kits to Dr. Mitchell prior to the May 4 oversight hearing. Dr. Kolowski claims that he gave Dr. Mitchell that number on May 6, and that he provided the correct number on May 7. Dr. Kolowski cites two emails dated: (1) May 7, 2015, in which he told various DFS officers, including Dr. Mitchell, to "discard the draft from 5/6/15," and updated them on the correct tally of untested sexual assault kits; and (2) May 8, 2015, in which he responded to Ms. Wiggins's May 4 email asking that he and Mr. Reedy answer the USAO's questions concerning the number of untested sexual assault kits. To further disprove Dr. Mitchell's competence rationale, Dr. Kolowski cites a conversation he had three days prior to his termination with Yi-Ru Chen, then-Chief Operations Officer of DFS, in which she told him that he was being considered for another promotion. Plus, Dr. Kolowski says, Deputy Mayor Donahue had told him that his job was

secure. And finally, the Human Resources Office informed him that he was terminated without cause.

The real reason he was terminated, Dr. Kolowski alleges, was for a protected disclosure he had made to DFS's new General Counsel Robert Hildum, who had replaced Ms. Funk in early May, reported directly to Dr. Mitchell, and was subject to Dr. Mitchell's expectation of being apprised of all important issues facing DFS. In a private meeting on May 11—one week before his termination—Dr. Kolowski had informed Mr. Hildum about his prior disclosure to Ms. Funk of the issue with MPD's firearms database. Dr. Kolowski explained to Mr. Hildum that the issue was "limited to just the MPD Firearms Intake Database" and that he "did not find any of th[o]se issues in the current [database]."[3]

The District denies that this report by Dr. Kolowski had anything to do with his termination. It points to Dr. Mitchell's sworn declaration in which he attested that "[n]o one directed or suggested that I terminate [Dr.] Kolowski[,] [and that] it was my decision alone and within my authority as Interim Director of DFS"; that

---

[3] Mr. Hildum may have been aware of the issue before his meeting with Dr. Kolowski. Ms. Funk, upon her departure, left a "multiple-page handwritten note for [her] successor, outlining all relevant and pressing issues" facing DFS, including "the MPD firearms issue."

"DFS General Counsel Robert Hildum did not advise me or otherwise encourage me to terminate [Dr.] Kolowski"; that "[Mr.] Hildum never spoke to me about the MPD Firearm Casework Database, or any issues regarding firearms, at any time before, during, or after my tenure at DFS"; and that "I was unaware of Jason Kolowski's claims regarding MPD's Firearms Casework Database, or any issues regarding firearms, until [Dr. Kolowski] filed the present lawsuit in 2016, and I was informed of Plaintiff's allegation by counsel." Dr. Kolowski's termination, Dr. Mitchell attested, was based solely on his lack of belief in Dr. Kolowski's competence.

On May 18, 2016, Dr. Kolowski filed suit against the District under the WPA, claiming that Dr. Mitchell terminated him because of the protected disclosure he had made to Mr. Hildum. On the District's motion for summary judgment, the trial court found that there was no triable issue of fact on whether Dr. Mitchell was aware of the protected disclosure he made to Mr. Hildum. The court accordingly dismissed Dr. Kolowski's claim because "[e]vidence of Dr. Mitchell's awareness that Dr. Kolowski blew the whistle is 'essential' to Dr. Kolowski's claim."[4]

---

[4] Quoting *McFarland v. George Washington Univ.*, 935 A.2d 337, 356 (D.C. 2007).

## II.

"We review a grant of summary judgment *de novo*, applying the same standard as the trial court."[5] In order to prevail under that standard, the moving party "must demonstrate that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law."[6] A fact is "material" if its existence "might affect the outcome of the suit under the governing law," and a factual issue is "genuine" if the evidence permits a reasonable fact-finder to find that issue in favor of the non-moving party.[7] In assessing whether summary judgment is proper, "[w]e view the record in the light most favorable to the non-moving party."[8]

The WPA prohibits a "supervisor" from "tak[ing], or threat[ening] to take, a *prohibited personnel action . . .* against an employee *because of* the employee's *protected disclosure*."[9] The District does not dispute that Dr. Kolowski's disclosures to Ms. Funk and Mr. Hildum were "protected disclosures" within the meaning of the

---

[5] *Johnson v. Washington Gas Light Co.*, 109 A.3d 1118, 1120 (D.C. 2015).

[6] *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583 (D.C. 2001).

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[8] *Childs v. Purll*, 882 A.2d 227, 233 (D.C. 2005).

[9] D.C. Code § 1-615.53(a) (emphasis added).

WPA.[10]  Nor does it dispute that his termination would qualify as a "prohibited personnel action" if done because of that disclosure.[11]

The dispute in this case is whether a jury could reasonably find that Dr. Mitchell terminated Dr. Kolowski because of his protected disclosure.  Section 1-615.54(b) lays out the following burden-shifting framework to assess that element:

> In a civil action or administrative proceeding, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by § 1-615.53 was a *contributing factor* in the alleged prohibited personnel action against an employee, the burden of proof shall be on the defendant to prove by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by this section [(emphasis added)].

The WPA defines "[c]ontributing factor" as "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision."[12]  "Employer awareness that the employee is engaged in protected activity

---

[10]  *See id.* § 1-615.52(a)(6) (defining "[p]rotected disclosure" to include "any disclosure" that the "employee reasonably believes evidences: (A) Gross mismanagement; . . . or (E) A substantial and specific danger to the public health and safety").

[11]  *See id.* § 1-615.52(a)(5)(A) (defining "[p]rohibited personnel action" to "include[] . . . actual termination").

[12]  D.C. Code § 1-615.52(a)(2).

is . . . *essential* to making out a *prima facie* case for retaliation."[13] Said another way, for a protected disclosure to be a contributing factor to adverse employment action, the employer must be aware of it. "[A]fter a plaintiff makes a *prima facie* case that his 'protected disclosure' was a 'contributing factor' in his dismissal, the burden shifts to the defendant to show by clear and convincing evidence that the plaintiff's dismissal would have occurred for 'legitimate, independent reasons' even if he had not engaged in activities protected under the [WPA]."[14]

Dr. Kolowski agrees that in order to clear his initial burden of establishing a *prima facie* case of retaliation, he "must show that the decision-makers responsible for the adverse action had actual knowledge of the protected activity."[15] But he claims to have "presented a preponderance of admissible evidence from which a reasonable fact-finder could infer that Dr. Mitchell was aware of Dr. Kolowski's disclosure to Mr. Hildum." In other words, Dr. Kolowski argues that, on the record before the court on the motion for summary judgment, a reasonable juror could find

---

[13] *McFarland*, 935 A.2d at 356 (quoting *Howard Univ. v. Green*, 652 A.2d 41, 46 (D.C. 1994)) (emphasis added).

[14] *Crawford v. District of Columbia*, 891 A.2d 216, 219 (D.C. 2006) (quoting D.C. Code § 1-615.54(b)).

[15] *McFarland*, 935 A.2d at 357 (emphasis in original).

that Dr. Mitchell is lying when he says he was not aware of Dr. Kolowski's protected disclosure. But although credibility determinations are left to the province of the jury, not the judge, "[t]he non-moving party cannot . . . avoid summary judgment 'merely by impugning [the] honesty' of the moving party's witness."[16] That is, "when an argument in opposition to a motion for summary judgment boils down to an allegation that defense witnesses are lying and when challenges to witness[es]' credibility are all that a plaintiff relies on, and he has shown no independent facts— no proof—to support his claims, summary judgment in favor of the defendant is proper."[17] Said another way, "[t]here must instead be evidence from which a rational factfinder could infer that the [defendants] lied."[18]

Dr. Kolowski admits he cannot present direct evidence that Dr. Mitchell was aware of his protected disclosure. Rather, he argues, a jury can reasonably infer it from circumstantial evidence, specifically, (1) the temporal proximity between his protected disclosure and termination, (2) Dr. Mitchell's expectation that all

---

[16] *Bradshaw v. District of Columbia*, 43 A.3d 318, 323 (D.C. 2012) (quoting *McCullough v. Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999)).

[17] *Perkins v. District of Columbia*, 146 A.3d 80, 86 (D.C. 2016) (quoting *Bradshaw*, 43 A.3d at 323) (internal quotation marks omitted).

[18] *Id.* at 86–87 (quoting *Clampitt v. Am. Univ.*, 957 A.2d 23, 37 (D.C. 2008)).

employees in DFS leadership would keep him apprised of all important issues facing DFS, and (3) the allegedly sham nature of Dr. Mitchell's rationale for terminating him. We disagree.

To start, the fact that Dr. Mitchell terminated Dr. Kolowski one week after Dr. Kolowski made the protected disclosure to Mr. Hildum, standing alone, does not support a reasonable inference that Dr. Mitchell was aware of his disclosure. That is because, while "very close" temporal proximity is no doubt relevant to employer awareness,[19] it is not dispositive.[20] And there is no other evidence in this record, considered in combination with the temporal proximity, reasonably suggesting that Dr. Mitchell was aware of Dr. Kolowski's protected disclosure.

Dr. Mitchell's expectation that employees in DFS leadership keep him apprised of all important issues facing DFS does not change that conclusion. To find for Dr. Kolowski, the jury would have to speculate that Mr. Hildum *actually* fulfilled that expectation.[21] There is no evidence from which a reasonable juror could infer

---

[19] *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (citation omitted).

[20] *Cf. Woodruff v. Peters*, 482 F.3d 521, 530 (D.C. Cir. 2007) ("[P]ositive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.").

[21] *Cf. Talavera v. Shah*, 638 F.3d 303, 313 (D.C. Cir. 2011) ("Talavera asserts that Streufert worked closely with Coston and Blackshaw, discussing personnel

that Dr. Mitchell's expectation created a custom, much less one that was understood to extend to information unrelated to the loss of accreditation in DFS's DNA lab. As Dr. Kolowski admitted, DFS was "under chaos mode." DFS leadership focused their attention on bringing the DNA lab back to accreditation. Ms. Wiggins, for example, aided that effort, even though she was the former director of DFS's firearms lab. It is notable that Dr. Kolowski did not himself inform Dr. Mitchell of the issue with MPD's firearms database, despite meeting with him on a daily basis; and that Dr. Kolowski assured Mr. Hildum that the issue was no longer a problem because it was limited to MPD's database and did not exist in the current one maintained by DFS. Clearly, Dr. Kolowski did not himself think the issue was pressing enough to inform Dr. Mitchell of it in the chaotic environment they were in. No reason appears why Mr. Hildum should have thought of the issue any differently.

Finally, there is no evidence from which a reasonable juror fairly could infer that Dr. Mitchell's disbelief in Dr. Kolowski's competence—more specifically, that Dr. Kolowski gave Dr. Mitchell an incorrect tally of untested sexual assault kits—

---

matters in the Office of Security on a regular basis and they hung out together. . . . [But] Talavera offered no evidence, for instance, of a managers' meeting between June 8 and 16, much less that Coston or Blackshaw revealed the referral for a mental health screening to anyone other than the examining physician.").

was not the real reason for Dr. Kolowski's termination. Dr. Kolowski denies that he furnished the erroneous number of sexual assault kits to Dr. Mitchell prior to the May 4 oversight hearing. Dr. Kolowski claims that he gave Dr. Mitchell that number on May 6, and that he provided the accurate number on May 7. This dispute is not dispositive, because Dr. Kolowski admittedly *did* misrepresent the number of untested kits on May 6 and provided no explanation with his correction on May 7. Dr. Mitchell attested that he terminated Dr. Kolowski because this misrepresentation was evidence that he was unreliable, and Dr. Kolowski has not presented evidence to dispute that determination.

Dr. Kolowski argues that Dr. Mitchell's rationale was false because there was no question of his competence at DFS. Dr. Kolowski points to: (1) Ms. Chen's communication to him three days prior to his termination that he was being considered for a promotion, and (2) Deputy Mayor Donahue's earlier assurance that his job was safe. However, there is no evidence either of them had spoken with Dr. Mitchell about Dr. Kolowski's performance, or that their encouraging words reflected Dr. Mitchell's evaluation of Dr. Kolowski at any time.

Dr. Kolowski argues that it would be an overreaction for Dr. Mitchell to deem him incompetent merely for providing an erroneous number of untested sexual

assault kits. Maybe so,[22] but without evidence supporting that theory, we cannot count that against the District. "[C]ourts are not free to second-guess an employer's business judgment."[23] Dr. Kolowski offers no evidence suggesting that Dr. Mitchell specifically, or DFS generally, felt that a precise count of untested sexual assault kits was unimportant.

Dr. Kolowski argues that the District has given shifting rationales for his termination, pointing to the fact that human resources had told him he was being terminated "without cause." But officially terminating him without cause is not exactly evidence of a "shifting rationale"; rather, it was simply providing no official rationale at all when none was required (because Dr. Kolowski was an at-will employee). Without more, Dr. Kolowski's termination "without cause" does not reasonably establish that Dr. Mitchell had not actually lost confidence in Dr. Kolowski's competence.

---

[22] But maybe not. It was very important for DFS to keep track and maintain an accurate, up-to-date tally of the untested sexual assault kits in its possession. *See* D.C. Code § 4-561.02(b) (2014) (requiring DFS to "process all sexual assault forensic examination kits within 90 days from the date of receipt").

[23] *Cain v. Reinoso*, 43 A.3d 302, 313 (D.C. 2012) (citation omitted).

We conclude that, on this record, there is no triable issue of fact regarding whether Dr. Mitchell was aware of Dr. Kolowski's protected disclosure. The trial court therefore did not err in granting summary judgment for the District.

## III.

Dr. Kolowski also claims that the trial court abused its discretion by declining to extend the discovery deadline so that he could take the District's deposition under Super. Ct. Civ. R. 30(b)(6), leading to a premature decision on the District's motion for summary judgment.

Preliminarily, Dr. Kolowski failed to preserve this challenge to the Superior Court's discovery ruling and subsequent award of summary judgment by opposing summary judgment with a Super. Ct. Civ. R. 56(d) affidavit or anything equivalent to it. "When a non-moving party fails to file a Rule [56(d)] affidavit showing how further discovery would provide 'facts essential to justify . . . [his] opposition,' and instead merely asserts that [he] 'was unable to effectively oppose the summary judgment motion because [he] was denied discovery,' this court will not disturb a trial court's order granting summary judgment."[24] But even if this omission were to

---

[24] *Briscoe v. District of Columbia*, 62 A.3d 1275, 1280 (D.C. 2013); *see also Kibunja v. Alturas, L.L.C.,* 856 A.2d 1120, 1125–26 (D.C. 2004).

be excused, we cannot conclude that the trial court abused its discretion by denying Dr. Kolowski's belated request for leave to take Rule 30(b)(6) discovery.

On April 26, 2017, Dr. Kolowski noticed a Rule 30(b)(6) deposition for February 4, 2017, a date that had already passed, requesting the District to produce a designee (or designees) who could testify with knowledge of eighteen enumerated topics. Two days later, the District objected to the notice on the grounds that the proposed topics for the deposition: (1) were not described with reasonable particularity, (2) were overbroad, (3) were outside the scope of information reasonably knowable to the District, and (4) covered confidential and privileged information. The record does not contain a response from Dr. Kolowski addressing the merits of those objections, or a motion by Dr. Kolowski to compel the discovery, and he does not raise any argument on appeal that the objections lacked merit.

On December 4, 2017, which was the day all discovery was supposed to have been completed, the District moved to extend the discovery deadline. Dr. Kolowski opposed the motion in part, but consented to an "extension so that the Plaintiff can take its 30(b)(6) deposition(s) and for the Defendant to take Plaintiff's deposition." Even then, however, Dr. Kolowski did not affirmatively move for relief from the discovery deadline or justify his need to take any further discovery. On January 3, 2018, the trial court denied the District's motion, among other reasons because

"[t]his case has been pending for over eighteen months, and an additional 90-day delay would be prejudicial to plaintiff Jason Kolowski." The court noted, however, that "this Order does not affect the District's ability to take Mr. Ko[]lowski's deposition, and his opposition indicates that he does not object to his deposition going forward consistent with his prior agreement." The court's order did not authorize other discovery.

Seven weeks later, on February 21, 2018, Dr. Kolowski asked the trial court to clarify its January 3 discovery ruling because the District had refused to consent to the Rule 30(b)(6) deposition he sought, "adopt[ing] the position that . . . the [trial court's order] speaks only to [the District's] ability to take [his] deposition[] and does not speak to [his] ability to conduct the Rule 30(b)(6) deposition." On March 12, 2018, the trial court denied the request for clarification. The court interpreted it as a motion for modification of its January 3 order, noting that although Dr. Kolowski had conditioned his agreement to be deposed on being able to take the District's deposition under Rule 30(b)(6), "he did not ask for that relief—or explain why he needed more time to complete his Rule 30(b)(6) deposition despite the prior extensions." "Equally important," the court noted, was that Dr. Kolowski "waited for about six weeks after issuance of the January 3 Order to file his motion for clarification." The court explained that extending the discovery deadline, as it already had done several times before, would guarantee that "discovery would not

be completed in time to keep the case on track with respect to the pretrial conference."

Dr. Kolowski argues that the trial court abused its discretion by denying his request to extend the discovery deadline and compel the District to submit to a Rule 30(b)(6) deposition. For several reasons, we disagree. First, Dr. Kolowski's request was untimely, and he furnished no excuse for its untimeliness. Second, the District raised several objections to Dr. Kolowski's Rule 30(b)(6) notice, and he has made no attempt to show why the District's objections were invalid or why any dispute over them would not have considerably delayed the pretrial conference. Third, although the trial court permitted the District to take Dr. Kolowski's deposition after the discovery deadline, Dr. Kolowski did not object to it, the District's request was not untimely, and taking his deposition did not raise concerns about delaying the pretrial conference. Fourth, it is simply not the case, as Dr. Kolowski argues, that the trial court's denial of his motion required him "to defend a summary judgment motion in a litigation posture where he was forced to fight with one hand tied behind his back." Dr. Kolowski has offered no reason—to us or to the trial court—to think that a Rule 30(b)(6) deposition would have been a reasonable or appropriate way for him to overcome the central flaw in his claim: the lack of evidence that Dr. Mitchell was aware of his protected disclosure. Nor has Dr. Kolowski provided any excuse for his own lack of diligence in pursuing discovery during the extended discovery

period. Fifth, it does not even appear that the denial of Dr. Kolowski's motion to extend the discovery deadline for a Rule 30(b)(6) deposition prevented him from pursuing the discovery that he needed to take, that he could have taken previously, but that he never sought to take. The two most important witnesses whom Dr. Kolowski failed to depose were Dr. Mitchell and Mr. Hildum; his Rule 30(b)(6) notice of deposition neither guaranteed Dr. Mitchell's deposition nor covered Mr. Hildum (who no longer worked at DFS during this discovery dispute); and Dr. Kolowski never attempted to subpoena either of them personally to testify at their own depositions, despite Rule 30(b)(6)'s express statement that it "does not preclude a deposition by any other procedure allowed by these rules."

We therefore conclude that the trial court did not abuse its discretion in denying Dr. Kolowski's belated request to extend the discovery deadline and compel the District to submit to a Rule 30(b)(6) deposition.

**IV.**

Based on the foregoing, we affirm the trial court's grant of summary judgment in favor of the District.

*So ordered.*