Geraldine E. HARRIS, Appellant,

v.

GROUP HEALTH ASSOCIATION,
INC., Appellee.

Nos. 79–2544, 79–2553.

United States Court of Appeals,
District of Columbia Circuit.

Argued 12 June 1981.

Decided 25 Aug. 1981.

Ellen R. Delate, Washington, D. C., for appellant in No. 79–2544 and for cross-appellee in No. 79–2553.

Stanley J. Brown, Washington, D. C., with whom Stewart S. Manela, Washington, D. C., was on the brief, for appellee in No. 79–2544 and for cross-appellant in No. 79–2553.

Before McGOWAN, WILKEY and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

In this action plaintiff/appellant Dr. Geraldine E. Harris alleges that she was discharged from her position at Group Health Association, Inc., in Washington, D.C., because of her race (she is black) in violation of Title VII of the Civil Rights Act of 1964[1] and the Civil Rights Act of 1866.[2] After a full trial the district court awarded judgment to defendant/appellee Group Health Association, Inc. Appellant challenges that judgment on appeal. We affirm the holding of the district court and, in addition, require appellant to pay appellee's costs and attorneys' fees incurred during the appeal.

## I. MERITS OF APPELLANT'S CLAIM

### A. Background

Appellee Group Health Association, Inc., (GHA) is a non-profit corporation operating as a health maintenance organization to provide prepaid health care to its 100,000 plus members in the Washington metropolitan community. GHA employs some 120 physicians, and as part of its operation has laboratories to provide test results and diagnostic data to these physicians and their patients. Appellant Dr. Harris was hired as Chief of Microbiology for the microbiology laboratory on 25 July 1977. Hired by Dr. Lupovich, GHA's Director of Laboratories, Dr. Harris had impressive credentials. At that time the microbiology lab was in dan-

ger of losing its license, and Dr. Lupovich created the position of Chief of Microbiology as part of his effort to improve the organization of the laboratory. The job description for the new position, prepared by Dr. Lupovich before appellant's employment, sets out the performance criteria for the position as follows:

The individual will be evaluated by his/her ability to show a thorough and comprehensive knowledge of test procedures and equipment used, such that their assigned responsibilities and duties are carried out in an informed, accurate, professional manner at the highest level of excellence. The individual will be able to recognize problems, identify the cause, create alternatives, and determine realistic pragmatic solutions. *There must be communications at an effective level enabling the translation of facts and ideas to a variety of persons with a variety of backgrounds, both within and outside the laboratory. Quite importantly, is the ability to supervise in an effective, professional, and friendly way those personnel assigned to the section of responsibility. The individual will carry out in an acceptable manner to the Director of Laboratories, all those directives both assigned and unassigned which constituted professional laboratory technology and management at the highest standard of excellence.*[3]

Soon after Dr. Harris came to work at the laboratory friction developed between her and the other managers and employees because of what was perceived as her inadequate performance. For instance, Johnny L. Manning, the Assistant Director of the Laboratory for Administrative Services, became dissatisfied with Dr. Harris' performance since, according to his testimony, she would arrive late and not amend her employee time card to reflect the reduced hours. Eventually other supervisors expressed concern about the fact that Dr. Harris was permitted to come and go with-

---

**1.** 42 U.S.C. § 2000e *et seq.* (1976).

**2.** *Id.* § 1981 (1976).

**3.** Plaintiff's Exhibit 3 (emphasis added).

out regard to normal working hours. Mr. Manning, who is black, testified that from the time Dr. Harris started in late July 1977 until February 1978, he had between ten and twenty conversations with Dr. Lupovich about difficulties he was having with Dr. Harris.

Another of Dr. Harris' associates, Chief Medical Technologist Mina Harkins, also had trouble with her. One of Dr. Harris' responsibilities was to visit GHA satellite laboratories. Yet despite repeated requests, Miss Harkins testified, Dr. Harris never went there after her introductory visit. Miss Harkins also noted Dr. Harris' frequent refusals to work weekends, and complaints concerning her lack of knowledge about GHA procedures for ordering supplies.

Mrs. Rose Crook, who was the Supervisor of Microbiology at GHA, testified that she had similar difficulties getting Dr. Harris to perform her duties and to communicate and work cooperatively with the rest of the staff. Mrs. Crook also is a black woman.

There was also testimony at the trial that Dr. Harris had been uncooperative in an incident involving the decontamination of a potentially contaminated area and in her completion of travel vouchers..

By November 1977 Dr. Lupovich, who testified that he had been trying to "bend backwards"[4] to save a potentially valuable person to the laboratory, began to doubt Dr. Harris' capacity for the job for which she had been hired. There had already been several meetings between Dr. Lupovich and Dr. Harris at which the former pointed out the need for improvement in the latter's performance. On 6 February 1978, after preparing Dr. Harris' six-month evaluation, Dr. Lupovich met with her to review her progress at GHA. The purpose of the meeting was to review Dr. Harris' evaluation and her duties, and to set forth a plan for her improvement. At the meeting, several witnesses testified, Dr. Harris was told again to hold regular meetings with the staff, to communicate with Mrs. Crook, and

to visit the satellite laboratories. Both in that meeting and in the written evaluation, the record indicates, Dr. Lupovich made it quite clear that Dr. Harris' work had been unsatisfactory and plainly stated that the problems identified would have to be overcome in order for Dr. Harris to continue at her position with GHA.

According to the trial testimony there was, however, no improvement. Indeed, in some respects Dr. Harris' performance became worse. The complaints which Dr. Lupovich received about Dr. Harris continued.

Dr. Lupovich finally decided that Dr. Harris could not remain at GHA. He testified that he called her into his office and, with Mr. Manning present, told her that her affiliation with GHA was not working and asked that she resign. Dr. Lupovich agreed when Dr. Harris requested several days for her to think things over. When she came back, at her request they discussed the reasons for the termination. Dr. Lupovich indicated that she had not carried out her responsibilities, that there had been incompatibility and lack of communication in the laboratory, and that she had not demonstrated leadership in her position as the Chief of Microbiology. Dr. Harris, however, said that she would not resign, and so Dr. Lupovich discharged her. Dr. Lupovich testified that Dr. Harris then said "she was not going to take that ... lying down, and that Group Health would have the worst time it's ever had ...."[5]

B.  *Appellant's Evidence*

The evidence which plaintiff presented at trial to show that she had been fired on grounds of race can be summarized briefly as (1) she was black, (2) the discharge rate for blacks at GHA was higher than the discharge rate for whites, and (3) GHA, in failing to render evaluative reports at definite intervals, did not follow its own rules of procedure in Dr. Harris' case. We shall consider each of these three arguments in turn.

4. Record at 334.

5. Record at 174.

■ Plaintiff argues that it is significant that she was black and that the person first considered to replace her was a white male.[6] But it is not enough to show only that plaintiff is black and, moreover, in this case there are a number of reasons for concluding that the mere fact that plaintiff is black was not the reason for her discharge. Most important, of course, is the fact that there is abundant evidence that the reason for appellant's discharge was her inadequate performance at her position. It is also significant that many of the complaints against Dr. Harris were lodged by people who also happened to be black. Moreover, it should be kept in mind that although it is true that Dr. Harris was fired, she was also hired by the same man who eventually discharged her. This at least raises the question, unanswered by appellant, of why a racially discriminatory organization or individual would have hired her in the first place.

The statistical evidence offered by appellant is similarly unconvincing. It is of course more difficult to prove a pattern of discrimination in a case such as the one at hand, where not only is the job position in question *sui generis*, but plaintiff was the first to hold it. Appellant argues, however, that discrimination can be deduced from the figures of GHA's hiring and firing of professionals generally. Appellant points to the fact that a higher percentage of blacks than whites has been fired *relative* to the percentage of blacks and whites hired:

PROFESSIONALS HIRED

|  | Total | Black |
|---|---|---|
| 1976 | 75 | 10 |
| 1977 | 91 | 18 |
| 1978 | 102 | 13 |

PROFESSIONALS FIRED

|  | Total | Black |
|---|---|---|
| 1976 | 2 | 1 |
| 1977 | 7 | 3 |
| 1978 | 5 | 2[7] |

We think it clear that these data are "too fragmentary and speculative to support a serious charge in a judicial proceeding."[8]

■ Evaluative reports were, under the rules of procedure of GHA, supposed to be rendered at definite intervals. Appellant argues that this procedure was not followed by Dr. Harris' supervising official, the person who hired her. However, the charge here is racial discrimination, and there is no evidence whatsoever of what relevance the failure to follow procedures has in regard to racial discrimination, or indeed that the prescribed procedures were followed in the evaluation of any white employees. At oral argument appellant's counsel informed the court that there were no other employees in any probationary category within her department during the time of her employment. It follows that there was no racial comparison to be made with respect to evaluation. On this record, then, there is no showing of any discrimination whatsoever, whether book procedure or a different usual practice was followed in regard to evalua-

6. To date, however, plaintiff's position has not been filled.

7. Brief of Appellant at 39.

8. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 621, 94 S.Ct. 1323, 1333, 39 L.Ed.2d 630 (1974). In this case the Supreme Court, while recognizing that "[s]tatistical analyses have served and will continue to serve an important role as one indirect indicator of racial discrimination," found the percentage comparisons undertaken by the appellate court to be "simplistic," and to "lack real meaning in the context of this case." *Id.* at 620, 94 S.Ct. at 1333. The Supreme Court pointed out in *Educational Equality League* that "the District Court's concern for the smallness of the sample presented by the 13-member Panel" challenged as being discriminatorily chosen was "well founded," and that the percentage comparisons offered "were correctly rejected by the District Court as meaningless." *Id.* at 621, 94 S.Ct. at 1333. If the 13-member Panel was too small in *Educational Equality League*, then for similar reasons we think it reasonable to conclude that the pool of 14 employees discharged over a three-year period is too small here. Like the Supreme Court, we find this type of proof to be "too fragmentary and speculative to support a serious charge in a judicial proceeding." *Id.*

tive reports. Our own interpretation of the record evidence, which was apparently that of the trial court, is that Dr. Harris' supervisor deliberately did not follow the written procedure because he wished to confer personally with her, and did so on eight to twelve occasions in regard to her lack of satisfactory performance on the job. Thus, he did not commit his tentative observations and conclusions to writing or follow a rigid formula. This was designed to be to appellant's advantage, if she were capable of making the necessary adjustments suggested by her supervisor.

■ Having reviewed appellant's evidence, it is worthwhile discussing what appellant does *not* allege. She alleges no racial slights or slurs occurring at any time during the nearly ten months of her employment. On the record there is no demonstrated tangible racial bias against appellant by anyone. Indeed, as was discussed before, it is significant that many of the complaints about Dr. Harris' performance were lodged against her by people who also happened to be black.

In addressing this problem, appellant's brief asserts, "Dr. Harris submits that [one such employee] . . . was accustomed to taking orders from whites and found a change to having to take orders from a black beyond her ability to adapt." [9] We think it significant not only that there was enough dissatisfaction among other blacks with Dr. Harris' performance that appellant felt compelled to address the issue in her brief, but also that her explanation of this phenomenon was so implausible.

■ One last aspect of appellant's case should be addressed. Appellant objects to the subjective criteria used in evaluating Dr. Harris' performance and in terminating her employment. While it is true that subjective criteria lend themselves to racially discriminatory abuse more readily than do objective criteria, there nonetheless are situations where employment decisions can, must, and should be made on the basis of subjective criteria. An employer who hires a worker on the basis of an excellent résumé should not be prevented from discharging that worker when it becomes apparent that, résumé or not, the worker cannot or will not perform adequately. In light of the purpose of the civil rights laws, it would be anomalous to hold that an employee's rights prohibit employers from considering anything but the prestige of an employee's background in evaluating his or her performance.

## C. Conclusion

We think the district court was eminently correct in finding that there was no racial discrimination in GHA's discharge of Dr. Harris. The facts which appellee marshaled are overwhelming, and the facts and legal arguments advanced by appellant are unconvincing.

## II. ATTORNEYS' FEES

■ The recitation of the above facts in this case makes it clear that appellant's counsel had a very difficult case to make for her client. Counsel performed diligently in the trial court but the net result, after the completion of the trial and rendering of the decision by the trial judge, was that appellant proved that she was hired, fired, and that she was black. That is the sum total of appellant's case.

Arguably, the case should never have been brought in the trial court. But in justification of appellant's action there, it can be said that she could not be sure what evidence would be discoverable by the usual procedures—evidence which might have sustained her charges of discrimination. We do not say that mere speculation and hope justify the bringing of a lawsuit. We do say that in this particular instance there was so little in the original record of circumstances that the bringing of the suit at the trial level was not totally unjustified.

However, after a full trial and an opinion by the district court, it seems clear to us that the case should never have been brought on appeal. The record as estab-

9. Brief of Appellant at 24.

lished in the trial court was barren of any possible justification for a favorable outcome to appellant. The appeal should not have been taken.

Citing *Christiansburg Garment Co. v. Equal Employment Opportunity Commission (Christiansburg Garment)*[10] appellee has asked for costs and attorneys' fees. We agree that, quoting from *Christiansburg Garment,* appellant had "no legal or factual basis"[11] to bring the appeal and that the appeal was "frivolous," "unreasonable," "without foundation" and "groundless."[12] Accordingly, we award appellate costs and attorneys' fees to appellee.[13]

The Court in *Christiansburg Garment* began by quoting section 706(k) of the Civil Rights Act of 1964: "In any action or proceeding under this Title the court, in its discretion, may allow the *prevailing* party ... a reasonable attorney's fee ..."[14] The Court found that, while defendant is not entitled to an award of attorneys' fees on the same basis as a prevailing plaintiff, it is also true that defendant need not show that plaintiff proceeded in bad faith. Instead, after reviewing the cases and statutes, the Supreme Court concluded that a court "may in its discretion award attorney's fees to a prevailing defendant in a Title VII case upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."[15] The Court went on to say that "[h]ence, a plaintiff should not be assessed his opponent's attorney's fees unless a court finds that his claim was frivolous, unreasonable, or groundless, *or that the plaintiff continued to litigate after it clearly became so.*"[16]

We think it important in the case at hand to note that the Court in *Christiansburg Garment* pointed out that "many defendants in Title VII claims are small- and moderate-size employers for whom the expense of defending even a frivolous claim may become a strong disincentive to the exercise of their legal rights. In short, there are equitable considerations on both sides of this question."[17]

Frivolous suits such as the one brought here do not aid the cause of civil rights. On the contrary, they undermine the legitimate efforts of those bringing legitimate suits, and draw scarce judicial resources away from those cases.[18]

10. 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978).

11. *Id.* at 420, 98 S.Ct. at 700.

12. *Id.* at 421–22, 98 S.Ct. at 700.

13. It is essential to note how closely the standards in *Christiansburg Garment* follow Congressional intent. The Senate Report on the Civil Rights Attorney's Fees Awards Act of 1976, amending 42 U.S.C. § 1988 (1976), stated that fees may be awarded to defendant when plaintiff's suit is "clearly frivolous, vexatious, or brought for harassment purposes." S.Rep. No.1011, 94th Cong., 1st Sess. 5 (1976), *reprinted in* [1976] U.S.Code Cong. & Ad.News 5908, 5912. The same Congressional intent was evidenced during the Senate floor discussions of the attorney's fees provision of Title II (42 U.S.C. § 2000a–3(b) (1976)), which, *Christiansburg Garment* pointed out, was almost identical to Title VII's (42 U.S.C. § 2000e–5(k) (1976)). 434 U.S. at 416. With respect to Title II's provisions, *see* Remarks of Senator Humphrey ("to diminish the likelihood of unjustified suits being brought"), 110 Cong.Rec. 6534 (1964); Remarks of Senator Lausche ("to deter the bringing of lawsuits without foundation"), *id.*

at 13668; Remarks of Senator Pastore ("to discourage frivolous suits"), *id.* at 14214.

*See also* Fed.R.App.P. 38 and 28 U.S.C. § 1912 (1976).

14. 434 U.S. at 413–14, 98 S.Ct. at 696 (quoting 42 U.S.C. § 2000e–5(k) (1976)) (emphasis added).

15. *Id.* at 421, 98 S.Ct. at 700.

16. *Id.* at 422, 98 S.Ct. at 701 (emphasis added).

17. *Id.* at 423 n.20, 98 S.Ct. at 701 n.20.

18. We believe the case at hand fits so squarely within the framework delineated by *Christiansburg Garment* that it is not necessary to discuss at length the numerous decisions of lower courts and writings of commentators on this issue. It is worth mention, however, that these decisions and writings spawned by *Christiansburg Garment* are entirely consistent with our opinion here. *See Harris v. Plastics Mfg. Co.,* 617 F.2d 438 (5th Cir. 1980); *Faraci v. Hickey-Freeman Co.,* 607 F.2d 1025 (2d Cir. 1979); *Fisher v. Fashion Inst. of Technology,* 491 F.Supp. 879 (S.D.N.Y.1980); *Obin v. Dist. No.*

## III. SUMMARY

We hold that the district court's finding for appellee on the merits was correct. We find the appeal taken by appellant to have been unjustified, and accordingly award costs and attorneys' fees to appellee. We remand to the district court for calculation of these awards.

*Affirmed and Remanded.*

9, *Int'l Ass'n of Machinists and Aerospace Workers*, 487 F.Supp. 368 (E.D.Mo.1980); *Moss v. ITT Continental Baking Co.*, 468 F.Supp. 420 (E.D.Va.1979); Note, *Procedural Characterization of Post-Judgment Requests for Attorney's Fees in Civil Rights Cases— Eliminating Artificial Barriers to Awards*, 49 Fordham L.Rev. 827 (1981); Recent Decision, *The United States May Recover Attorney's Fees Under General Equitable Principles When*

*It Has Been Sued Vexatiously and in Bad Faith Under Title VII of the Civil Rights Act of 1964*, 29 Emory L.J. 859 (1980); Comment, *The Civil Rights Attorney's Fees Awards Act of 1976: A View From the Second Circuit*, 29 Buff.L.Rev. 559 (1980). *See also Baez v. United States Dep't of Justice*, No. 79–1881 (D.C. Cir. 10 July 1981) (Wilkey, J., dissenting); *Sek v. Bethlehem Steel Corp.*, 421 F.Supp. 983 (E.D.Pa. 1976).