# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 17, 2011      Decided January 17, 2012

No. 10-5419

GARY HAMILTON,
APPELLANT

v.

TIMOTHY F. GEITHNER, SECRETARY OF THE UNITED STATES
TREASURY,
APPELLEE

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:05-cv-01549)

———

*David A. Branch* argued the cause and filed the briefs for appellant.

*Jeremy S. Simon*, Assistant U.S. Attorney, argued the cause for appellee. With him on the brief were *Ronald C. Machen Jr.*, U.S. Attorney, and *R. Craig Lawrence*, Assistant U.S. Attorney.

Before: TATEL and GARLAND, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Appellant, an employee of the Internal Revenue Service, alleges that the Service discriminated against him on the basis of race and gender when it awarded a temporary detail and then a permanent promotion to a white female employee. Appellant also claims that the IRS retaliated against him when he pursued the matter with its Equal Employment Opportunity office. The district court granted summary judgment to the government on all three claims. We agree that appellant failed to exhaust his claim regarding the temporary detail and so affirm that portion of the district court's judgment. But because we conclude that a reasonable jury could find that the government's proffered nondiscriminatory reason for denying appellant the permanent promotion was pretextual and that discrimination was the real reason, we reverse the grant of summary judgment on the discriminatory promotion claim and remand to allow that claim to proceed to trial. And because we conclude that appellant established a prima facie case of retaliation, we remand that claim for further proceedings consistent with this opinion.

## I.

Gary Hamilton, an African American man, has served as an industrial hygienist in the federal government for much of his career. After earning a bachelor's degree in industrial hygiene and a master's degree in public health, Hamilton spent approximately fifteen years as an Industrial Hygienist for the Navy and the Department of Defense, a GS-13 grade position under the federal government's General Schedule pay scale. In October 2001, when Hamilton's position was relocated to another city, he accepted employment as a GS-12 Industrial Hygienist within the IRS's Real Estate and Facilities Management department.

About a year-and-a-half later, the IRS announced a vacancy for a GS-14 "Safety Specialist (Safety/ Occup[ational] Health Manager)" position, which we shall refer to as the Safety Manager position. In May 2003, Hamilton applied for that position, as did other IRS employees. Paul Carroll, an IRS program analyst, ranked the candidates based upon knowledge, skills, and abilities (KSA) criteria provided to him by IRS personnel staff. Based on Carroll's rankings, personnel staff selected the four highest-scoring candidates for the "best qualified" list, including Hamilton, Annette Burrell (a white female), Camille Carraway (a white female), and Michael Perkins (a white male). Of these, Hamilton, Burrell, and Caraway had each received the highest possible KSA ranking score of 25, while Perkins had received a score of 19. The four candidates were interviewed by a three-member panel consisting of "selecting official" Stuart Burns (a white male), Mike Huston (a white male), and Tatika Mitchell (an African American female). Although panel members took notes during the interviews, they neither rated nor scored the applicants. In July 2003, Burns selected Annette Burrell for the position.

Hamilton learned of Burrell's selection sometime in August. He also discovered that one year earlier, in August 2002, Burrell had received a temporary detail assignment as a GS-14 Management Analyst/National Safety and Health Project Manager, a position Hamilton claims was expressly designed to qualify Burrell for the Safety Manager position. Shortly thereafter, Hamilton contacted the IRS's Equal Employment Opportunity (EEO) office for a counseling session, in which he claimed that IRS officials acted with a discriminatory motive in (1) selecting Burrell, a "demonstrably" less-qualified white female, for the Safety Manager position; (2) affording Burrell preferential treatment by "giving [her] a detail (for 12 months) into the position";

and (3) using a subjective evaluation process to create a legitimate explanation for its discriminatory selection. EEO Counseling Report at 2; *see also* 29 C.F.R. § 1614.105(a) (requiring aggrieved persons to "consult a Counselor prior to filing a complaint in order to try to informally resolve the matter"). On October 21, 2003, Hamilton filed a formal EEO complaint alleging that IRS selecting officials discriminated against him on the basis of gender and race by "select[ing] a Caucasian female with observably and vastly inferior qualifications" for the Safety Manager position. EEO Compl. at 2. Later, in January 2004, Hamilton learned that Burns had detailed Camille Carraway—the other white female interviewed for the Safety Manager position—to a temporary GS-14 Safety Manager position, prompting Hamilton to file another EEO complaint, this one alleging discrimination and retaliation in the decision to award the detail to Carraway.

When the EEO failed to take any action within 180 days from the filing of Hamilton's complaint, *see* 29 C.F.R. § 1614.407(b) (authorizing civil actions if no final action is taken within 180 days after a complaint is filed), Hamilton sued the Treasury Secretary in the United States District Court for the District of Columbia. In his original complaint, Hamilton asserted two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.: that the 2003 selection of Annette Burrell over Hamilton for the Safety Manager position was motivated by race- and gender-based discrimination (the "discriminatory promotion claim"), and that the 2004 selection of Camille Carraway for the Safety Manager detail amounted to retaliation in response to Hamilton's EEO filing (the "retaliation claim"). Hamilton subsequently amended his complaint to assert a third claim alleging that the 2002 selection of Burrell for a temporary GS-14 Management Analyst detail was discriminatory and a

prohibited personnel practice in violation of the Civil Service Reform Act, 5 U.S.C. § 2302 (the "detail claim").

The Secretary moved for summary judgment on all claims. As to Hamilton's discriminatory promotion claim, the Secretary, though conceding that Hamilton had established a prima facie case of discrimination, claimed that the IRS had a legitimate, nondiscriminatory reason for promoting Burrell over Hamilton, namely, that Hamilton did not perform as well as Burrell in the interview. In considering Hamilton's argument that this proffered nondiscriminatory reason was pretextual, the district court first addressed his claim that the "inexplicable gulf between the credentials of [Hamilton] and Burrell" was "inherently indicative of discrimination." *Hamilton v. Paulson*, 542 F. Supp. 2d 37, 44 (D.D.C. 2008) ("*Hamilton I*") (internal quotation marks omitted). Although acknowledging that Hamilton's "superior educational credentials and experience as an industrial hygienist suggests that he may have had a stronger grasp of the technical aspects of occupational safety," the court observed that Burrell's "considerable experience in developing safety management programs at a national level" indicated that she might have been "better equipped" for other aspects of the position. *Id.* at 47. After reviewing the two candidates' relevant experience, and noting that each had received perfect KSA scores, the court found "no factual basis whatsoever for a jury to conclude that there are disparities in the relative qualifications of the plaintiff and Burrell" significant enough to support an inference of discrimination. *Id.* The court then reviewed Hamilton's allegations that the selection process suffered from numerous irregularities, that the IRS had destroyed evidence, that inconsistencies undermined its evidence, and that it exhibited a pattern of promoting white females over African Americans. As to each of these claims, the court found that Hamilton's allegations either lacked support in the

record or suggested no bias. *Id.* at 48–57. "Nothing in the record," the district court concluded, "would permit a reasonable jury to infer that the defendant's explanation . . . is in any way a pretext for discrimination." *Id.* at 57. Accordingly, the court granted summary judgment to the Secretary on Hamilton's discriminatory promotion claim.

The district court also granted summary judgment to the government on Hamilton's retaliation claim. *Id.* at 61. The court found that Hamilton had failed to establish a prima facie case because he had shown no causal connection between his statutorily protected EEO activity and the selection of Carraway for the 2004 Safety Manager detail. Observing that although a plaintiff may establish causation by showing that the defendant "had knowledge of his protected activity and that the adverse personnel action took place shortly after that activity," the court pointed out that district courts in this circuit generally follow an informal "three-month rule" for cases in which a plaintiff attempts to establish a prima facie case of retaliation based on temporal proximity alone. *Id.* at 58 (quotation and alterations omitted). Measuring temporal proximity based solely on Hamilton's first protected activity—the August 2003 EEO counseling session—the district court concluded that the five- to six-month gap between that session and the January 2004 Carraway selection precluded Hamilton from establishing causation based on temporal proximity alone. In so concluding, the district court rejected Hamilton's argument that the time period between his protected activity and the adverse employment action should be measured from October 2003, when he filed his EEO complaint, and that Burns had engaged in a "pattern of antagonism" against Hamilton in the months leading up to Carraway's selection. *Id.* at 58–61.

In a later ruling, the district court granted summary judgment to the Secretary on Hamilton's 2002 detail claim. According to the district court, Hamilton had failed to exhaust his administrative remedies as required by both Title VII and the Civil Service Reform Act. *Hamilton v. Geithner*, 743 F. Supp. 2d 1, 13–14 (D.D.C. 2010) ("*Hamilton II*").

Hamilton now appeals, and we review the district court's grant of summary judgment de novo. *Jones v. Bernanke*, 557 F.3d 670, 674 (D.C. Cir. 2009).

## II.

We begin with Hamilton's claim that the 2002 selection of Burrell for a temporary GS-14 detail violated both Title VII and the Civil Service Reform Act. Government employees alleging discrimination in violation of Title VII or challenging personnel practices prohibited by the Civil Service Reform Act must exhaust administrative remedies before bringing their claims to federal court. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) ("Title VII complainants must timely exhaust their administrative remedies before bringing their claims to court." (internal quotation marks and alterations omitted)); *Weaver v. U.S. Info. Agency*, 87 F.3d 1429, 1433 (D.C. Cir. 1996) ("Under the [Civil Service Reform Act], exhaustion of administrative remedies is a jurisdictional prerequisite to suit."). Because Hamilton's 2002 detail claim presented a "mixed case," involving charges of both discrimination and prohibited personnel practices, Hamilton could have exhausted his administrative remedies by presenting his claim either to the IRS's EEO office or to the Merit Systems Protection Board. *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999) ("An employee who intends to pursue a mixed case . . . can choose between filing a 'mixed case complaint' with her agency's EEO office and filing a

'mixed case appeal' directly with the MSPB."). As the district court found, however, Hamilton did neither.

Hamilton has never claimed that he sought review before the Merit Systems Protection Board, insisting instead that he exhausted his detail claim before the IRS's EEO Office. But Hamilton's formal EEO complaint makes no mention of the 2002 detail. Instead, the complaint identifies only the 2003 Safety Manager selection as the alleged discriminatory action. Indeed, it describes that selection decision quite specifically, providing both the position title and vacancy announcement number. Moreover, in a follow-up letter to Hamilton, the EEO office identified the claim to be investigated as whether Hamilton had been discriminated against "when he was not selected on August 11, 2003, for promotion to the position of Safety and Health Manager, GS-0018-14, under Vacancy Announcement Number 15-02-OFM03706." Letter from Jerry Armstrong, Dir., Treasury Compl. Ctr., to Howard Wallace, Designated Representative for Gary Hamilton (Dec. 17, 2003). The letter goes on to state: "If you disagree with the claim, please notify me in writing within 15 days of the date of the letter. . . . If no response is received, I will assume that you agree with the claim(s) and will proceed with the investigation of the complaint." *Id.* Hamilton neither responded to this letter nor "amend[ed] [his] complaint at any time prior to the conclusion of the investigation," 29 C.F.R. § 1614.106(d), to include the 2002 detail claim.

Hamilton nonetheless argues that he satisfied the exhaustion requirement by presenting his detail claim to the IRS during his August 2003 EEO counseling session, approximately two months before he filed his formal EEO complaint. In support, he cites the EEO counseling report, pointing out that it lists the 2002 detail as part of the basis for his discrimination claim. *See* EEO Counseling Report at 2

(describing Hamilton's allegation that IRS "[p]lanned, arranged and executed with a discriminatory motive to give [Burrell] preferential treatment by giving a detail (for 12 months) into the [Safety Manager] position"). But this does not help Hamilton. Filing a formal complaint is a prerequisite to exhaustion, *see* 29 C.F.R. § 1614.407 ("A complainant *who has filed an individual complaint* . . . is authorized under title VII . . . to file a civil action in an appropriate United States District Court" after final EEO action or after 180 days (emphasis added)), so Hamilton cannot rely on the EEO counseling report to establish exhaustion of a claim that he failed to include in his formal complaint.

According to Hamilton, however, the government has waived its exhaustion defense. But Hamilton's first argument in support of this proposition—that the IRS "waived" exhaustion by accepting and then dismissing his detail claim without proper notice—fails because his formal EEO complaint omitted the detail claim. *See* 29 C.F.R. § 1614.107(b) ("Where the agency believes that some but not all of the claims *in a complaint* should be dismissed . . . the agency shall notify the complainant in writing of its determination[.]" (emphasis added)). His second argument— that the Secretary waived the defense in the district court— likewise fails because the Secretary not only raised exhaustion as an affirmative defense in his answer, but also moved to dismiss on exhaustion grounds after Hamilton asserted the detail claim in his amended complaint. We shall therefore affirm the district court's dismissal of Hamilton's detail claim for failure to exhaust administrative remedies and turn our attention to the two claims properly before us.

## III.

In support of his promotion discrimination claim, Hamilton argues that the Secretary's proffered reason for

denying him the GS-14 Safety Manager promotion—that Hamilton " 'did not perform well in his interview . . . as compared to [Burrell's] performance,' " *Hamilton I*, 542 F. Supp. 2d at 43 (quoting Def.'s Mem. at 7)—was pretext for discrimination. According to Hamilton, the district court erred in granting summary judgment on this claim because a reasonable jury could infer discrimination based on evidence of (1) Hamilton's superior qualifications for the Safety Manager position, (2) the highly subjective nature of the government's reasons for not hiring Hamilton, and (3) procedural irregularities in the selection process.

Where, as here, the employer claims a legitimate, non-discriminatory explanation for its decision to promote one employee over another, the "one central inquiry" on summary judgment is "whether the plaintiff produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008). We consider this question "in light of the total circumstances of the case," asking "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff . . . or any contrary evidence that may be available to the employer." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289, 1291 (D.C. Cir. 1998) (en banc). Because in appropriate cases a "factfinder's disbelief of the reasons put forward by the defendant" may support an inference of intentional discrimination, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993), we do not routinely require plaintiffs "to submit evidence over and above rebutting the employer's stated

explanation in order to avoid summary judgment." *Aka*, 156 F.3d at 1290. In reviewing the district court's grant of summary judgment, moreover, we view the evidence in the light most favorable to Hamilton and draw all reasonable inferences in his favor, taking care neither to make credibility determinations nor weigh the evidence before us. *Jones*, 557 F.3d at 674, 681. Ultimately, we may affirm the district court's judgment only if we are able to conclude that no reasonable jury could reach a verdict in Hamilton's favor. *Id.* at 674.

Although Hamilton relies on a wide range of evidence to attack the Secretary's proffered nondiscriminatory explanation, the parties' briefs focus first and foremost on the evidence of Hamilton's and Burrell's qualifications, so we shall begin there as well. The Supreme Court has held that "qualifications evidence may suffice, at least in some circumstances," to show that an employer's proffered explanation is pretext for discrimination. *Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). Although the Court has declined to define "precisely what standard should govern," *id.*, our cases have developed a framework for evaluating claims "involving a comparison of the plaintiff's qualifications and those of the successful candidate." *Aka*, 156 F.3d at 1294. Pursuant to our decision in *Aka v. Washington Hospital Center*, "[i]f a factfinder can conclude that a reasonable employer would have found the plaintiff to be significantly better qualified for the job, but this employer did not, the factfinder can legitimately infer that the employer consciously selected a less-qualified candidate—something that employers do not usually do, unless some other strong consideration, such as discrimination, enters into the picture." *Id.* That said, "we must assume that a reasonable juror who might disagree with the employer's decision, but would find the question close, would not usually infer discrimination on

the basis of a comparison of qualifications alone." *Id.* For this reason, a disparity in qualifications, standing alone, can support an inference of discrimination only when the qualifications gap is "great enough to be inherently indicative of discrimination"—that is, when the plaintiff is "markedly more qualified," "substantially more qualified," or "significantly better qualified" than the successful candidate. *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (internal quotation marks omitted).

Applying this standard here, we believe, as explained in detail below, that a jury confronted with the record evidence could find that Hamilton had far more formal training and education than Burrell, significantly greater technical expertise, and broader experience developing and managing complex safety programs. Whether this evidence would be sufficient to allow such a jury to find Hamilton "significantly" or "markedly" more qualified than Burrell, *Holcomb*, 433 F.3d at 897, and thus to infer discrimination based on qualifications evidence alone, presents a relatively close question. Given the record in this case, however, it is a question we need not conclusively resolve. Our task is to "review the record taken as a whole," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation marks omitted), and plaintiffs are "expressly *not* limited to comparing [their] qualifications against those of the successful applicant; [they] may seek to expose other flaws in the employer's explanation." *Holcomb*, 433 F.3d at 897; *see also Ash*, 546 U.S. at 458 (noting approvingly the Eleventh Circuit's suggestion that "superior qualifications may be probative of pretext when combined with other evidence"). Here, Hamilton relies not only on comparative qualifications evidence, but also "seek[s] to expose," *Holcomb*, 433 F.3d at 897, procedural irregularities in a highly subjective selection process. Reviewing the record as a whole, we agree that the

evidence of Hamilton's superior qualifications taken together with "other flaws in the employer's explanation," *id.*, creates a genuine issue of material fact that only a jury can resolve.

The qualifications evidence includes the position description, the candidates' applications, Hamilton's declaration, and Burrell's deposition testimony. According to the position description, the GS-14 Safety Manager position "provides senior analytical support to management in assessing and defining the needs of the Agency for implementation and evaluation of IRS Safety Program." Position Description at 2. The position requires a mix of technical and policy expertise, including "[e]xpert level knowledge of and extensive experience in the theories, principles, practices and advances pertaining to safety and occupational health disciplines and administration." *Id.* The position description lists the Safety Manager's four major duties: (1) developing policies, procedures, and standards for the IRS Safety Program and providing technical guidance to protect IRS personnel and property "from the full spectrum of intentional and non-intentional human threats, as well as man-made and natural disasters"; (2) advising "top management on the most complex safety matters," including budgetary and resource-distribution issues related to safety; (3) interpreting national safety directives, formulating broad policy direction, and preparing policy and program statements for senior management; and (4) serving both as a "top liaison" to other government agencies and as a "technical authority" on novel safety issues. *Id.* Although focusing primarily on the required technical expertise and safety policy experience, the position description also states that the Safety Manager position involves "[f]requent, extensive personal contacts . . . with top levels of management and staff . . . . to defend, promulgate, secure, and gain compliance with the Service's Safety Program." *Id.* at 3.

When Hamilton applied for the position in May 2003, he had approximately nineteen years of experience working in industrial hygienist and safety professional positions within the federal government, including approximately fifteen years as a GS-13 Industrial Hygienist with the Navy and Department of Defense and nearly two years as a GS-12 Industrial Hygienist with the IRS. Hamilton has a bachelor's degree in industrial hygiene (defined as "the science of anticipating, recognizing, evaluating, and controlling workplace conditions that may cause workers' injury or illness," Occupational Safety & Health Admin., Informational Booklet on Industrial Hygiene (1998), *available at* http://www.osha.gov/Publications/OSHA3143/ OSHA3143.htm), as well as a master's degree in public health with a specialty in environmental and occupational health. Hamilton has been certified by the American Board of Industrial Hygiene since 1995, and he completed a master's level Senior Executive Leadership Training program for the federal government sector in 2000.

By contrast, Burrell has no college degree and little formal training in occupational safety. Her knowledge of safety practice and policy comes mostly from on-the-job training, as well as one forty-hour OSHA class and a few two- to three-day courses on indoor air quality, electrical standards, and principles of industrial hygiene. In comparison to Hamilton's nineteen consecutive years of service as an industrial hygienist, Burrell had approximately eight years of substantive safety experience at the time of her application, much of it prior to 1997. Specifically, she worked for approximately four years as a GS-11 Program Analyst/Regional Safety Officer (1990–1994), two-and-a-half years as a GS-12 Safety and Occupational Health Manager (1994–1997), and less than one year on a temporary detail as a GS-14 National Safety and Health Project Manager (2002–

2003). During the more than five years between April 1997, when she left her GS-12 Safety and Occupational Health Manager position, and August 2002, when she began her temporary detail, Burrell appears to have had little contact with the safety field, having transferred first to a position as a Space Acquisition Specialist (1997–2000) and then to a Client Services Specialist position (2000–2002). Perhaps because of Burrell's less extensive training and experience, selecting official Burns stated that she "was not as qualified as [Hamilton] in the technical aspects of industrial hygiene and safety." Burns Decl. at 3. The district court agreed, finding that Hamilton's "superior educational credentials and experience as an industrial hygienist suggest[] that he may have had a stronger grasp of the technical aspects of occupational safety." *Hamilton I*, 542 F. Supp. 2d at 47.

In addition to Hamilton's superior technical expertise, he possessed wide-ranging experience in developing safety policies and managing complex, large-scale safety programs. While working at the Defense Department, for instance, Hamilton managed the Department's Worker Safety Pilot Program, a large project that involved analyzing private-sector safety programs, implementing and evaluating pilot programs at different military sites, integrating budgeting and fiscal planning with safety program development, and preparing a final report to Congress. In that position, Hamilton also served as the point of contact for the administration of a memorandum of understanding between the Assistant Secretary of Defense and the Deputy Under Secretary, and communicated with senior Defense Department program officers to coordinate safety and health policy across military departments. Similarly, while working for the Navy, Hamilton managed its Hazard Abatement Program, leading a group of forty base safety managers, playing a leadership role in setting mission priorities for all

Navy divisions, and managing a $4.5 million budget. Finally, during his most recent IRS assignment, Hamilton's responsibilities included conducting resource assessments, developing budgets, managing safety inspectors, and developing and writing policy. He also developed the first standard operating procedure for the Service's semi-annual safety inspections and created a database program "capable of inputting, retrieving, and reporting specific safety inspection data." Hamilton Appl. Given this extensive, detailed, and concrete evidence of Hamilton's safety policy and program experience, a reasonable jury could easily find him well-positioned to perform the "extremely complex and significant functions in the development of [safety] decisions and policies," Position Description at 2, required by the Safety Manager position.

To be sure, Burrell also has experience in safety policy and project management. In her application for the Safety Manager position, she states that as a GS-12 Safety and Occupational Health Manager, she "[d]eveloped policies and procedures for use Servicewide . . . to enable regions to implement programs," designed a nationwide safety management system for use in analyzing data and identifying safety-related trends, and "was responsible for setting regional and national policy and program direction." Burrell Appl. Burrell also revitalized Atlanta's Federal Safety and Health Council, a task requiring that she establish an alliance between the IRS and OSHA. Finally, during her detail as National Safety and Health project manager, Burrell played a key role in developing a National Concept of Operations for IRS's National Safety and Health Program, *id.*, acting as project leader and bringing in various stakeholders to develop safety procedures.

That said, the Secretary's evidence that Burrell actually formulated policies or provided guidance "on the most complex safety matters," Position Description at 2, is comparatively thin. While Burrell may have gained some safety policy experience during her two-and-a-half years as a GS-12 Safety and Occupational Health Manager, the record contains scant evidence of specific policies or programs that Burrell herself developed. *See* Burrell Appl. (stating only in general terms that she "[d]eveloped policies and procedures for use Servicewide to regional staffs to enable regions to implement programs" and "was responsible for setting regional and national policy and program direction"). Moreover, a jury could find that Burrell's recent detail focused significantly more on planning activities and "ensur[ing] buy-in" from stakeholders than on formulating safety policy or providing advice on complex safety matters. *See* Burrell Appl. (describing her work as "plan[ing] numerous activities associated with the reengineering" of the safety program, leading a working group with business unit representatives to "ensure buy-in," developing "action plans . . . to ensure that each [business stakeholder] had a chance to comment on the Vision of the new Safety and Health program," and holding monthly meetings with stakeholder points of contact to address concerns and provide consultations). Indeed, asked during her deposition what safety policies she had written, Burrell was unable to name a single one. Burrell Dep. at 59 ("Q: What policy did you write? A: I—I don't recall."). She was also unable to cite specific safety-related policies or executive orders or to articulate "major conflicts in safety policy and program objectives," Burrell Dep. at 59–61, 68–70, knowledge specifically required for the Safety Manager position, Position Description at 2. In contrast to this relatively weak evidence of Burrell's policy knowledge and experience, the evidence supporting Hamilton's qualifications demonstrates a deep

understanding of safety policies and procedures and contains specific and extensive descriptions of safety policies he himself developed and administered. *See supra* 15–16.

The government argues that Burrell's perfect KSA score is dispositive of her comparative qualifications. We disagree. Not only did Hamilton also have a perfect KSA score, but that score, a preliminary assessment designed to identify candidates worthy of further consideration, makes no comparison of one candidate's qualifications to another's. *See* Carroll Dep. at 87 ("I don't rank [the candidates] against each other. I rank them against the KSAs."). Underscoring the preliminary nature of the KSA rankings, the interview panelists reviewed the candidates' full application packages, *see* Burns Decl. at 2, and considered themselves responsible for assessing the candidates' qualifications, *see* Mitchell Decl. at 2 (stating that the interview panel assessed candidates "on their knowledge of the safety program, their knowledge of the IRS . . . their experience working program items at a national level and their abilities to lead"). Given all this, a jury could conclude that the KSA scores were never intended to be conclusive and that there might be substantial variation in qualifications between candidates with identical scores, particularly where, as here, the ranking official had no formal safety or security training. *See* Carroll Dep. at 36.

Accordingly, and drawing all reasonable inferences in Hamilton's favor, we believe that a reasonable jury could find that, by comparison to Burrell, Hamilton had much greater technical expertise, more experience developing complex, large-scale safety programs, and far more formal training in occupational health and safety. This combination of superior knowledge and experience, in turn, could lead the jury to conclude that Hamilton was significantly better qualified for the Safety Manager promotion. But even if this disparity

alone is insufficient, a reasonable jury, considering Hamilton's stronger qualifications together with "other flaws in the employer's explanation," *Holcomb*, 433 F.3d at 897, could still reach a verdict in Hamilton's favor. These flaws fall into two categories.

First, the record contains no contemporaneous documentation of the Secretary's proffered explanation—that Burrell outperformed Hamilton in the interview. Neither selecting official Burns nor the other panelists appear to have created any written evidence of their deliberations or their reasons for choosing Burrell, leaving us with no record of the decisionmaking process beyond notes taken during the interviews. Burns's and Mitchell's notes contain no comments, positive or negative, regarding Hamilton's interview performance or communications skills, thus weakening their claim that they selected Burrell because Hamilton's interview "did not go well," Mitchell Decl. at 2. *See Aka*, 156 F.3d at 1298 (reasoning that the decisionmaker "did not comment at all on Aka's enthusiasm (or the lack thereof) on the interview summary sheet, weakening her claim that Aka's lack of enthusiasm motivated her decision"). Indeed, the only contemporaneous documentation of Hamilton's performance appears in Huston's notes, where he wrote that Hamilton "[r]estated questions; thinks through answers," an observation that a jury could conclude reflected a judgment that Hamilton carefully and thoughtfully responded to panelists' questions. At the very least, Huston's comment is ambiguous. And as Hamilton points out, we have no way of knowing what else Huston may have written during the interview given that one page (amounting to half of his notes on Hamilton's interview) is missing and unaccounted for. Although we certainly do not suggest that a jury must or should draw an adverse inference, this absence of documentation, coupled with the missing page of Huston's

interview notes, *could* lead a reasonable jury to doubt the Secretary's explanation, particularly given that the IRS requires documentation of a promotion action "sufficient for a reviewer to reconstruct the action in its entirety" as well as maintenance of complete promotion files for two years. Internal Revenue Manual § 6.335.1.12.16 (2002).

Second, the Secretary's proffered non-discriminatory explanation relies heavily—indeed entirely—on subjective considerations, and our case law instructs us to treat such explanations with caution on summary judgment. *See Aka*, 156 F.3d at 1298 (noting that "courts traditionally treat explanations that rely heavily on subjective considerations with caution" and that "an employer's heavy use of highly subjective criteria, such as interpersonal skills, could support an inference of discrimination" (internal quotation marks omitted)). Although "employers may of course take subjective considerations into account in their employment decisions," we have repeatedly expressed concern about the ease with which heavy reliance on subjective criteria may be used to "mask" or "camouflage" discrimination. *Id.* (internal quotation marks omitted). "Subjective criteria," we have explained, "lend themselves to racially discriminatory abuse more readily than do objective criteria." *Harris v. Group Health Ass'n, Inc.*, 662 F.2d 869, 873 (D.C. Cir. 1981).

In our view, several considerations make caution particularly appropriate here. For one thing, the IRS job description does not emphasize communications skills, providing only a brief description of the Security Manager's representative and liaison functions at the end of a much more detailed discussion of the position's technical knowledge and policy experience requirements. *See* Position Description at 2–3. Even assuming that communications skills were critical to the position, the record contains only vague descriptions of

Hamilton's interview performance. Although Burns and Mitchell stated generally that Hamilton's answers were confusing and difficult to follow, they provided no concrete examples of poor answers that might have grounded their subjective assessment in more objective facts. Indeed, Burns appears to have based his assessment of Burrell's interview performance in part on her "presentation of self," Burns Decl. at 3, a highly subjective criterion that a jury could well view as "lend[ing]" itself quite "readily" to gender-based or "racially discriminatory abuse," *Harris*, 662 F.2d at 873. Huston, moreover, could recall nothing at all about Hamilton's performance. *See* Huston Decl. at 2 (stating that he could not "remember any specifics from the interview").

Given the vague and subjective nature of the panelists' assessment, a jury might find further reason for caution in Hamilton's performance evaluation (included in his application package), which rated him highly in the categories of "Interaction" and "Verbal Communications/Listening," Hamilton Appl. And as mentioned above, Burrell had substantial difficulty responding to deposition questions about safety policies she had written or used as a federal safety professional. *See* Burrell Dep. at 58–60. Were Burrell to testify at trial as she did in her deposition, a jury might not only find her markedly less qualified than Hamilton, but also doubt the strength of her communications skills and her ability to perform well under the pressure of an interview.

To sum up, then, we believe that, when taken together, the evidence of a significant disparity in the candidates' qualifications, the highly subjective nature of the Secretary's proffered nondiscriminatory explanation, and the absence of any contemporaneous documentation supporting that explanation could lead a reasonable jury to disbelieve the Secretary and to reach a verdict in Hamilton's favor. Of

course, after hearing live testimony, assessing witness credibility, and weighing the evidence, the jury might also conclude that Hamilton was not significantly more qualified than Burrell and that Burrell's interview performance legitimately tipped a difficult choice in her favor. But the record suggests that these issues "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). We shall therefore reverse the grant of summary judgment on Hamilton's discriminatory promotion claim and remand for trial.

## IV.

For his third and final claim, Hamilton contends that the decision to award Camille Carraway a GS-14 Safety Manager detail in January 2004 was retaliation for Hamilton's pursuit of a discrimination complaint with the IRS EEO office. To make out a prima facie case of retaliation, a plaintiff must show that "(1) he engaged in protected activity; (2) he was subjected to an adverse employment action; and (3) there was a causal link between the protected activity and the adverse action." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007). Hamilton argues that the close temporal proximity between the filing of his EEO complaint and Carraway's selection is sufficient to establish a prima facie case of retaliation. We agree.

For purposes of establishing a prima facie case of retaliation, "[t]emporal proximity can indeed support an inference of causation, but only where the two events are very close in time." *Id.* (citation and internal quotation marks omitted); *see also Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) ("[T]his circuit has held that a close temporal relationship may alone establish the required causal connection."). Although the Supreme Court has cited circuit

decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor this court has established a bright-line three-month rule. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing approvingly cases finding three- and four-month intervals insufficient to establish a prima facie case, but holding only that "[a]ction taken . . . 20 months later suggests, by itself, no causality at all"). Instead, we have evaluated the specific facts of each case to determine whether inferring causation is appropriate. *Cf. Taylor v. Solis*, 571 F.3d 1313, 1322 (D.C. Cir. 2009) (finding a two-and-a-half month interval insufficient to overcome the employer's asserted non-retaliatory explanation "on the record [in that case]," without addressing the temporal proximity required to establish a prima facie case).

When the district court evaluated Hamilton's temporal proximity claim, it considered only the interval between Hamilton's August 2003 EEO counseling session and the January 20, 2004 decision to detail Carraway—a five-month interval the court found insufficient to establish causation. *Hamilton I*, 542 F. Supp. 2d at 57–58. Apparently believing that only Hamilton's first statutorily protected activity was relevant to the temporal proximity analysis, the district court rejected his argument that proximity should instead be measured from October 21, 2003, when he filed his formal EEO complaint. *Id.* at 58. As Hamilton points out, however, we have held that courts should consider later protected activity in determining whether evidence of temporal proximity satisfies the causation element. *See, e.g.*, *Jones*, 557 F.3d at 680 ("[B]ecause Title VII and the ADEA protect employees who engage in any protected activity, we have repeatedly held that an adverse action following closely on

the heels of protected activity may in appropriate cases support an inference of retaliation even when occurring years after the initial filing of charges."); *Singletary*, 351 F.3d at 524 (finding error where "[i]n concluding that there was insufficient temporal proximity between the defendants' alleged retaliatory actions and Singletary's protected activity, the district court failed to take account of protected activity that Singletary undertook long after the original protected activity" (internal quotation marks omitted)).

Measured from the October filing of Hamilton's formal complaint, the period between his statutorily protected activity and the adverse employment action is just under three months. Moreover, given Hamilton's claim that Burns "ignored" him in December 2003 when he requested information regarding the detail, Appellant's Br. 40; *see also* Hamilton Aff. at 8, it appears that Burns actually took a first step toward the adverse action just two months after Hamilton filed his formal complaint. The Secretary insists that Hamilton never argued in the district court that Burns's December 2003 brush-off constituted an adverse employment action. But Hamilton did allege that Burns's behavior formed part of a pattern of antagonism leading up to the adverse action, *see Hamilton I*, 542 F. Supp. 2d at 60, and we consider it here as additional evidence supporting an inference of causation. The record before us, then, suggests that Hamilton was denied information about a possible detail just two months after filing an EEO complaint and, approximately one month later, was ultimately passed over for the detail. The Secretary claims that Hamilton failed to show that Burns knew of his complaint, but at the prima facie stage the fact that Hamilton submitted the complaint to the agency is sufficient. *See Jones*, 557 F.3d at 679 (suggesting that the agency's knowledge of protected activity may be sufficient, at least at the prima facie stage).

Considering the "minimal burden" imposed at the prima facie stage, *Holcomb*, 433 F.3d at 903, we find the evidence sufficient to establish a prima facie case of retaliation. The Secretary, pointing out that he has already come forth with a legitimate, non-retaliatory explanation for Carraway's selection, Def.'s Mot. for Summ. J. at 17–18, urges us to resolve "the ultimate issue of retaliation *vel non*," *Jones*, 557 F.3d at 678. But given that the issue is not fully briefed on appeal, we decline to do so. *See Liberty Property Trust v. Republic Properties Corp.*, 577 F.3d 335, 341 (D.C. Cir. 2009) ("Although we review all questions of law de novo and have the discretion to consider questions of law that were not passed upon by the District Court, this court's normal rule is to avoid such consideration." (alterations and internal quotation marks omitted)). Instead, we shall remand Hamilton's retaliation claim for the district court to determine in the first instance whether a reasonable jury could conclude that the Secretary's proffered explanation was pretext for retaliation, keeping in mind that "positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine." *Woodruff*, 482 F.3d at 530.

## V.

For the foregoing reasons, we affirm the district court's grant of summary judgment on Hamilton's 2002 detail claim. We reverse the grant of summary judgment on Hamilton's promotion discrimination and retaliation claims and remand for further proceedings consistent with this opinion.

*So ordered.*